U–HAUL INTERNATIONAL, INC., U–Haul Co. of North Carolina, U–Haul Co. of the West Coast of Florida, and U–Haul Co. of Michigan, Appellants–Defendants,

Mildred Radwan, individually and on behalf of the Estate of Francis J. Radwan, Jr., Appellants–Plaintiffs,

v.

The MIKE MADRID COMPANY and R.W. Armstrong, Inc., Appellees–Defendants,

State of Indiana, Valley Asphalt Corp., et al., Appellees–Defendants.

No. 49A02–9911–CV–759.

Court of Appeals of Indiana.

June 30, 2000.

Publication Ordered Aug. 17, 2000.

**1050**

Michael C. Peek, Rodney V. Taylor, Michael A. Beason, Christopher & Taylor, Indianapolis, Indiana, Attorneys for Appellants U–Haul International, Inc., et al.

Thomas J. Grau, Pamela A. Paige, White & Raub, Indianapolis, Indiana, Attorneys for Appellee R.W. Armstrong, Inc.

## OPINION

NAJAM, Judge

### STATEMENT OF THE CASE

U–Haul International, Inc., U–Haul Co. of North Carolina, U–Haul Co. of the West Coast of Florida, and U–Haul Co. of Michigan (collectively "U–Haul"), R.W. Armstrong, Inc. ("R.W. Armstrong"), The Mike Madrid Company ("Madrid"), Valley Asphalt Corp. ("Valley Asphalt"), and the State of Indiana were defendants in a wrongful death action arising out of an automobile accident in which Francis J. Radwan, Jr. was killed. The trial court entered summary judgment in favor of R.W. Armstrong and Madrid and against Radwan's estate. U–Haul appeals, presenting the following issue for our review:

> Whether R.W. Armstrong and Madrid are entitled to summary judgment based upon the acceptance rule.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On the afternoon of June 8, 1995, Francis Radwan, Jr. was driving through a two-lane construction zone on Interstate 74. Directly behind Radwan's car was a U–Haul truck and trailer. When traffic came to an abrupt halt, the driver of the U–Haul truck and trailer lost control and crashed into the back of Radwan's car at an angle. The car was propelled over a temporary bituminous divider[1] and into the path of an oncoming vehicle. Radwan was killed.

Radwan's estate brought a wrongful death suit against several entities, including U–Haul, R.W. Armstrong, Madrid, the general contractor Valley Asphalt, and the

---

1. A temporary bituminous divider is general-

ly an eighteen-inch-wide by four-inch-high

State of Indiana. The complaint alleged that R.W. Armstrong, the engineering firm subcontracted by the State's Department of Transportation ("INDOT") to design the Interstate 74 construction project, failed "to design and create a construction zone which was reasonably safe for all motorists[.]" Record at 181. The complaint further alleged that Madrid, the project's signage subcontractor, failed "to provide, direct and ensure the erection of proper signage for the safety of traffic flow through the construction zone." *Id.* at 177. R.W. Armstrong and Madrid moved for summary judgment, each arguing that the State's acceptance of its work prior to the accident in which Radwan was killed precluded its liability as a matter of law.

The trial court heard oral argument on R.W. Armstrong and Madrid's motions. It granted summary judgment in favor of R.W. Armstrong, finding:

1. In relation to ... [the Interstate 74 construction project], R.W. Armstrong prepared its plans and specifications pursuant to, and in conformance with, INDOT's standard plan drawings and specifications;

2. That prior to the subject incident, INDOT engineers reviewed and accepted the plans and specifications completed by R.W. Armstrong;

3. That there is no evidence that R.W. Armstrong's plans and specifications, or any elements contained therein, were inherently dangerous, and;

4. That there is no evidence ... that R.W. Armstrong had construction phase responsibilities.

*Id.* at 1196. The trial court also granted summary judgment in favor of Madrid, finding that:

1. [Madrid's] work on the [Interstate 74 construction] project consisted of furnishing, placing and maintaining signs, barricades, temporary pavement markings, markings on the temporary bituminous divider, and other traffic control devices. All of Madrid's work was conducted pursuant to plans, specifications and directions of the [S]tate of Indiana.

2. The determination of what signs were appropriate, and the locations in which various signs would be placed (including the presence, absence or location of speed limit signs) were outside the scope of the work performed by Madrid on the project, and were decisions made by the State of Indiana and its agents.

3. Madrid did not place the temporary bituminous divider separating two lane, two way traffic on any portion of the project. Madrid had no role in supervising the handling and transportation of the materials within the construction zone. Madrid did not design areas of ingress and egress for construction traffic, nor give or enforce directions in that regard. [Madrid] had no duty with regard to any of these activities.

4. The State of Indiana and its agents inspected and accepted the sign installation work performed by [Madrid] prior to the accident on June 8, 1995.

5. The work performed by [Madrid] and the condition in which it was left were not dangerously defective, inherently dangerous, or imminently dangerous.

*Id.* at 1198–99. U–Haul, a remaining defendant in the wrongful death action, appeals.[2]

---

asphalt center curb that also holds plastic delineators. Record at 358. The bituminous divider at issue here was measured by the investigating police officer at "approximately [six inches] high." Record at 703. U–Haul's claims on appeal, however, do not involve the height discrepancy, but rather, the use of the bituminous divider itself.

2. Radwan's estate settled its claims against R.W. Armstrong and Madrid before our deci-

sion in this case. U–Haul, nevertheless, pursues this appeal on the basis that it is prejudiced by the trial court's grant of summary judgment in favor of a potential nonparty for whom fault could be allocated under the Indiana Comparative Fault Act. *See* IND.CODE § 34–51–2–1 *et seq.; see also* IND.CODE § 34–6–2–88 (defining nonparty as "a person who caused or contributed to cause the alleged injury, death, or damage to property but who

## DISCUSSION AND DECISION

### I. Standard of Review

When reviewing a motion for summary judgment, we apply the same standard as the trial court, and we resolve any doubt as to any fact or inference to be drawn therefrom in favor of the party opposing summary judgment. *Slutsky v. Crews*, 713 N.E.2d 288, 290 (Ind.Ct.App.1999). Summary judgment is appropriate only if the designated evidentiary matter shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.;* Ind. Trial Rule 56(C). A defendant in a negligence action may obtain summary judgment by demonstrating that the undisputed material facts negate at least one element of the plaintiff's claim or that the claim is barred by an affirmative defense. *Hapner v. State*, 699 N.E.2d 1200, 1203 (Ind.Ct.App. 1998). The party appealing the entry of summary judgment has the burden of persuading this court that the trial court's grant of summary judgment was erroneous. *Slutsky*, 713 N.E.2d at 290.

### II. Acceptance Rule

■ Radwan's estate was required to prove the following elements in order to prevail on its claims of negligence against R.W. Armstrong and Madrid: "(1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; and (3) injury to the plaintiff proximately caused by that breach." *See Jacques v. Allied Bldg. Servs. of Ind., Inc.*, 717 N.E.2d 606, 608 (Ind.Ct.App.1999). The only element at issue here is whether R.W. Armstrong and Madrid owed a duty to Radwan, a motorist traveling through the Interstate 74 construction project. Specifically, both companies argued that they did not owe any duty to Radwan because their work had been accepted by the State prior to the fatal accident.

■ Indiana has long followed the rule that an independent contractor does not owe a duty of care to third parties after an owner has accepted the work. *See Blake v. Calumet Const. Corp.*, 674 N.E.2d 167, 170 (Ind.1996) (citing *Daugherty v. Herzog*, 145 Ind. 255, 44 N.E. 457 (1896)). As such, evidence of the independent contractor's mere negligence is insufficient to impose liability against the contractor after acceptance of the work by the general contractor or owner. *Jacques*, 717 N.E.2d at 608. Our supreme court has enumerated several factors in evaluating "acceptance" in this context, including whether:

> (1) the owner or its agent reasserted physical control over the premises or instrumentality; (2) the work was actually completed; (3) the owner expressly communicated an acceptance or release of liability; or (4) the owner's actions permit a reasonable inference that the work was accepted.

*Blake*, 674 N.E.2d at 171. When considering these factors, "the focus is on whether the owner was better able than the contractor to prevent injury to third parties at the time the harm occurred." *Id.*

■■ An exception to the acceptance rule makes a contractor liable for injuries to third persons even after the work has been completed and accepted by the owner, where the work was left "in a condition that was dangerously defective, inherently dangerous or imminently dangerous such that it created a risk of imminent personal injury." *Hill v. Rieth–Riley Const. Co.*, 670 N.E.2d 940, 944–45 (Ind.Ct.App.1996) (citations omitted). Any liability imposed under this exception, however, is limited where the contractor has merely followed the plans, specifications, and directions provided by the owner. *Ross v. State*, 704 N.E.2d 141, 144 (Ind.Ct.App.1998). Specifically, where a contractor is not following his or her own plans, but those provided by the owner, "liability is imposed only

has not been joined in the action as a defendant."). The Act requires a fact finder to apportion fault to the parties and nonparties and to apportion the damages consistent with

the level of fault. *Wal–Mart Stores, Inc. v. Wall*, 712 N.E.2d 1015, 1018 (Ind.Ct.App. 1999).

where the plans are so obviously defective that no reasonable contractor would follow them." *Id.*

## III. Application of the Acceptance Rule to R.W. Armstrong

### A. Acceptance

▮ U–Haul argues that there exists a genuine issue of material fact with regard to whether the State accepted R.W. Armstrong's design plans for the Interstate 74 construction project, thereby precluding an entry of summary judgment based on the acceptance rule.[3] In particular, U–Haul claims there was no evidence that the State had expressly accepted the construction plans or released R.W. Armstrong from liability prior to the accident in which Radwan was killed. We disagree.

The designated evidence reflects that R.W. Armstrong certified its final plans for the construction project and submitted them to INDOT for approval on November 30, 1993. Record at 293. The plans were reviewed, accepted and approved by IN-DOT engineers before INDOT issued its Notice to Proceed with implementation of the construction project on June 15, 1994. *Id.* Our supreme court has observed that an owner "can indicate an acceptance by re-occupying, leasing, selling or *otherwise using the premises in a manner inconsis-*

*tent with further physical control or construction activity by the contractor.*" *Blake*, 674 N.E.2d at 171 (emphasis added). Likewise, INDOT's Notice to Proceed with the construction project would have been inconsistent with a determination that it had not yet accepted R.W. Armstrong's plans for the project. Indeed, INDOT's acceptance of the plans is illustrated unequivocally by its implementation of them and the fact that the construction zone was in place at the time of the collision. Although the State's construction activity was not yet complete, R.W. Armstrong's responsibilities with respect to the construction project were confined solely to the design phase, which terminated upon INDOT's Notice to Proceed. *See Hapner*, 699 N.E.2d at 1205 (holding that State and general contractor's acceptance of subcontractor's work was established as matter of law; subcontractor completed work it was asked to do and construction project continued on without it's participation).

Nevertheless, U–Haul contends that R.W. Armstrong's work was ongoing at the time of the accident and that as such, there could have been no acceptance by the State. In support of its position, U–Haul points to R.W. Armstrong's contract with INDOT, which reads in part:

3. U–Haul initially argues that the acceptance rule does not apply to R.W. Armstrong because the engineering firm "is more akin to an architect than [a] construction contractor." Brief of Appellant at 9. U–Haul cites *Hiatt v. Brown*, 422 N.E.2d 736, 739 (Ind.Ct. App.1981) for the proposition that "a builder or architect's responsibility to third parties terminate[s] upon completion of the structure and acceptance by the owner." As such, it urges that R.W. Armstrong's liability should have continued until completion of the Interstate 74 construction project. U–Haul's reliance on *Hiatt* is misplaced.

First, both parties in *Hiatt* conceded negligence for purposes of the appeal, and the sole issue was whether Hiatt's injuries were proximately caused by the negligence of the architect who designed the airport expansion where Hiatt was injured. *See id.* at 738. Second, *Hiatt* addressed the exception to the rule requiring privity between an injured

third party and a contracted architect, that is, "the privity barrier ... collapse[s] if it is established that the architect's design was done so negligently as to create a condition imminently dangerous to third persons." *Id.* at 740. Even if we were to apply the privity rule exception in this case, as U–Haul suggests, the exception appears identical to the acceptance rule's "inherently dangerous" exception, which we do apply. As discussed later, U–Haul does not prevail as a matter of law on the "inherently dangerous" exception. *See* discussion *infra* Part III.B. Neither can we agree that the acceptance rule is inapplicable because R.W. Armstrong's work was equivalent to that of an architect rather than of a construction contractor. *See Ross v. State*, 704 N.E.2d 141 (Ind.Ct.App.1998) (applying acceptance rule in case involving road resurfacing contractor for INDOT). *See* discussion *infra* Part III.A.

During the course of construction, [R.W. Armstrong] shall be available at reasonable times during normal working hours to respond to reasonable inquiries concerning the accuracy and or intent of [its] plans....

If during the construction phase it is determined that unforeseen or unusual conditions arise, [R.W. Armstrong] shall revise the plans based on current conditions.

Record at 541.

Even if R.W. Armstrong had made itself available to inquiries concerning the accuracy or intent of its plans, this would not negate the State's prior acceptance of those plans. Moreover, there is no evidence that any unusual conditions arose during the construction phase such that R.W. Armstrong was revising its plans at the time of the accident. To the contrary, the record is undisputed that R.W. Armstrong had no physical presence at the construction site from early June 1994, approximately one year before the fatal collision. *See Hapner*, 699 N.E.2d at 1205 (observing that subcontractor had no participation or presence on the construction site for the ten months between completion of its work and the automobile accident). The contract between INDOT and R.W. Armstrong specifically provides that R.W. Armstrong has "no ... authority over, or responsibility for, the means, methods, techniques, sequences or procedures of construction." Record at 948. Accordingly, INDOT, not R.W. Armstrong, was in a better position to prevent injury to motorists traveling through its construction zone. *See Blake*, 674 N.E.2d at 171. We conclude that the State's acceptance of R.W. Armstrong's plans for the Interstate 74 construction project was established as a matter of law.

**B. Risk of Imminent Personal Injury**

■ The question remains, then, whether the construction plans created by R.W. Armstrong posed a risk of imminent personal injury such that liability may be imposed despite the State's acceptance of those plans. U–Haul contends that there

exists a genuine issue of material fact as to whether R.W. Armstrong's plans were inherently dangerous because they incorporated a temporary bituminous divider in conjunction with a designated speed limit greater than 45 miles per hour ("mph"). U–Haul refers us to Part VI, Section 6F–5(h) of the Federal Manual of Uniform Traffic Devices ("FMUTD"), which provides that "[t]he temporary raised island should only be used on roadways with speeds of 45 mph or less except when recommended by an engineering study." Record at 1071.

■ We have held that "[t]he term 'inherently dangerous' is more properly applied to activities or instrumentalities which are, by their nature, always dangerous, i.e. blasting or wild animals." *Hill*, 670 N.E.2d at 945. Thus, this exception to the acceptance rule applies only to "continuously dangerous activities and instrumentalities." *Id.* R.W. Armstrong's construction plans simply do not rise to the level of danger necessary to fall within the "inherently dangerous" exception.

By its nature, a temporary bituminous divider is a protective device used to separate two-way traffic flow through a construction zone. *See id.* (observing that guardrail is a safety device designated to prevent greater harm from occurring to errant vehicles). Here, U–Haul alleges that the bituminous divider was dangerous only because it was used in conjunction with a posted speed limit in excess of 45 mph. It does not contend that the bituminous divider itself was "continuously dangerous," nor can we discern from the designated evidence that the divider incorporated in R.W. Armstrong's construction plans was of such dangerous character. *See Ross*, 704 N.E.2d at 145–46 (concluding that superelevated curve in road was not always dangerous and posed a problem only to some types of vehicles that navigated curve in particular manner); *Hill*, 670 N.E.2d at 945 (holding that because particular guardrail was not always dangerous and posed problem only when

hit by vehicle in particular manner, such danger was not sufficient to impose liability on contractor who installed guardrail).

One plaintiff's expert characterized the temporary bituminous divider as a "hazard," and "particularly inappropriate where traffic speeds exceed 45 mph." Record at 346–47. Another expert characterized the construction zone as "an unreasonably unsafe situation." *Id.* at 355. Neither expert, however, indicated in his report the likelihood that the divider would cause an accident or the likelihood that it would pose a reasonably certain or imminent danger to a motorist. *See Ross,* 704 N.E.2d at 146 (recognizing that expert opinion supported conclusion that superelevated curve in road was dangerous, but that expert failed to indicate the likelihood that such defect would cause accident or that defect posed reasonably certain or imminent danger to vehicle).

Moreover, it is undisputed that R.W. Armstrong incorporated a temporary bituminous divider into its construction plans because INDOT's standard specifications required that particular divider be utilized to delineate the travel lanes within the construction site. R.W. Armstrong was mandated by contract to comply with INDOT's standard specifications, and the final determination to use a bituminous divider was made by INDOT, not R.W. Armstrong. Where a contractor is not following his or her own plans, but those provided by the owner, "liability is imposed only where the plans are so obviously defective that no reasonable contractor would follow them." *Id.* at 144. The MUTCD defines "should" as "an advisory condition. Where the word 'should' is used, it is considered recommended but not mandatory." Record 1070. Thus, the MUTCD merely recommends that a temporary bituminous divider not be used in areas with designated speeds of over 45 mph. In light of the advisory nature of the MUTCD provision, we cannot say that no reasonable contractor would have followed INDOT's standard specifications.

Accordingly, the acceptance rule precludes R.W. Armstrong's liability as a matter of law. The trial court did not err when it granted summary judgment in favor of R.W. Armstrong and against Radwan's estate on that basis.

## IV. Application of Acceptance Rule to Madrid

### A. Acceptance

■ Madrid has chosen not to file an appellee's brief in this case. Where the appellee fails to file a brief on appeal, it is within our discretion to reverse the trial court's decision if the appellant makes a prima facie showing of reversible error. *Hubbard v. Hubbard,* 690 N.E.2d 1219, 1220 (Ind.Ct.App.1998). This rule was established for our protection, so we might be relieved of the burden of controverting the arguments advanced in favor of reversal where such burden properly rests with the appellee. *Id.*

■ U–Haul contends that there exists a genuine issue of material fact with respect to whether the State accepted Madrid's installation of signage on the Interstate 74 construction project prior to the accident that killed Radwan, thereby precluding an entry of summary judgment based on the acceptance rule. Again, we must disagree. The designated evidence reflects that the installation of the signage for the phase of the construction project encompassing June 8, 1995 was completed on or before April 30, 1995, and was accepted by INDOT on or about May 11, 1995. Record at 372. INDOT Inspector Linda Jean Obermeyer testified that the signs were inspected and approved before the affected portion of highway could even be opened to traffic. *Id.* at 423. We thus conclude that the State's acceptance of Madrid's work was established as a matter of law.

### B. Risk of Imminent Personal Injury

■ We next consider whether the work performed by Madrid posed a risk of imminent personal injury such that liabili-

ty may be imposed despite the State's acceptance of its work. U–Haul contends that there exists a genuine issue of material fact as to whether the failure to post a 45 mph sign in an area where a temporary bituminous divider was in place was inherently dangerous. It again points to the FMUTD provision stating that "[t]he temporary raised island should only be used on roadways with speeds of 45 mph or less except when recommended by an engineering study." Record at 1071. Again, we disagree with U–Haul's position.

The evidence is undisputed that Madrid had nothing to do with the placement or utilization of the temporary bituminous divider in the Interstate 74 construction zone. In addition, Michael Madrid testified that INDOT, not Madrid, determined what signage would be acceptable for the construction project. He advised, "We didn't feel like we had the engineering expertise to decide what the project design should be, . . . what types or legend should be on signs that were on that project. It . . . was not a responsibility that we assumed." Record at 1019. He further testified, "I think there's some standards . . . that may be adhered to [when determining the speed within a highway construction zone]. Not being an engineer, I don't know how they determine those. . . . That's an area we don't get involved with. We just do what they tell us." *Id.* at 1023. Steve Apple, an estimator for Madrid, confirmed that the determination of the appropriate speed limit for the construction zone was "outside of the scope of work Madrid agreed to perform." *Id.* at 372. Paul Cain, Valley Asphalt's construction project superintendent, testified that he did not provide "any plans or specs for the construction zone" to Madrid, and that Valley Asphalt was responsible for supervising the placement of temporary speed limit signs for the duration of the project. *Id.* at 379, 381. There was no evidence to the contrary.

In sum, INDOT provided Madrid with a list of signs that the Interstate 74 construction project required and the location those signs were to be placed. Madrid simply did what it was told, and had neither the expertise nor the authority to do otherwise. Accordingly, U–Haul's contention that Madrid should have challenged the use of the temporary bituminous divider where posted speeds exceeded 45 mph is without merit. Moreover, given the advisory nature of the FUMTD's provision governing temporary bituminous dividers, we cannot say that no reasonable signage contractor would have followed INDOT's specifications with respect to signage.

The acceptance rule precludes Madrid's liability as a matter of law. The trial court did not err when it granted summary judgment in favor of Madrid and against Radwan's estate on this basis.

## CONCLUSION

In conclusion, we hold that the State accepted R.W. Armstrong and Madrid's work on the Interstate 74 construction project prior to the accident in which Radwan was killed. That acceptance extinguished R.W. Armstrong and Madrid's liability to a third party traveler like Radwan as a matter of law. The trial court did not err when it granted summary judgment in favor of R.W. Armstrong and Madrid and against Radwan's estate on the basis of the acceptance rule.

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.

## ORDER

This Court having heretofore on June 30, 2000, handed down its opinion in this appeal marked Memorandum Decision, Not for Publication; and,

Comes now the Appellee, R.W. Armstrong & Associates, Inc., by counsel, and files herein its Motion to Publish Memorandum Decision, alleging therein that said decision establishes or otherwise clarifies a rule of law and involves legal and factual issues of unique interest in the area of construction law, that said decision is a case of first impression in Indiana concerning the applicability of the acceptance doc-

trine to an independent architect or engineering entity and prays that this Court's Memorandum Decision in this case be published in order to establish as precedent the applicability of the acceptance doctrine to design professionals to avoid inconsistent trial court results on that issue and to provide guidance to counsel seeking to advise their clients under similar factual situations, which said Motion is more particularly in the following words and figures, to-wit:

(H.I.)

And the Court, having examined said Motion and being duly advised, now finds that said Motion should be granted and that this Court's opinion in this appeal should now be ordered published.

IT IS THEREFORE ORDERED as follows:

1. The Motion of the Appellee, R.W. Armstrong & Associates, Inc., to Publish Memorandum Decision is granted and this Court's opinion heretofore handed down in this cause on June 30, 2000, marked Memorandum Decision, Not for Publication is now ordered published.