Pauline **McBRIDE**, as the Personal Representative of the **ESTATE OF Dennis A. McBRIDE, Deceased; Pauline McBride, Individually; Tina D. McBride,** as Personal Representative of the Estate of Terry L. McBride, Deceased; **Tina D. McBride, Individually, and Paul McBride and Emily McBride, Minors, b/n/f Tina D. McBride, Appellants–Plaintiffs,**

v.

**COLE ASSOCIATES, INC., Appellee–Defendant.**

No. 30A05–0103–CV–96.

Court of Appeals of Indiana.

Aug. 13, 2001.

Dawn E. Wellman, Allen, Wellman, McNew, Greenfield, Indiana, Attorney for Appellants.

Diane W. French, Barry L. Lubow, Columbus, OH, C. Thomas Billings, Greenfield, Indiana, Attorneys for Appellee.

## OPINION

RILEY, Judge

### STATEMENT OF THE CASE

Appellants–Plaintiffs, Pauline McBride, as the personal representative of the estate of Dennis McBride, deceased; Pauline

McBride, individually; Tina McBride, as the personal representative of the estate of Terry McBride, deceased; Tina McBride, individually; and Paul McBride and Emily McBride, minors b/n/f Tina McBride (hereinafter collectively referred to as "the McBrides"), appeal the trial court's grant of Appellee–Defendant's, Cole Associates Inc. (Cole), Motion for Summary Judgment.

We affirm.[1]

### ISSUE

The McBrides raise two issues on appeal, which we consolidate and restate as follows: whether the trial court erred in granting Cole's Motion for Summary Judgment.

### FACTS AND PROCEDURAL HISTORY

The facts relevant to our disposition are as follows. On October 25, 1995, Terry McBride was driving a pickup truck in the eastbound lane of I–70 near mile marker 113 in Hancock County, Indiana. Dennis McBride was a passenger. Terry and Dennis entered into a construction area where traffic was channeled into two lanes, with each lane going an opposite direction. These two lanes of traffic were separated by a temporary bituminous divider (TBD). The posted speed limit through the construction zone was 55 miles per hour.

Eastbound traffic had come to an abrupt halt due to an unknown traffic slowdown some distance ahead of the McBrides' vehicle. At this point, the McBrides' vehicle was on the shoulder of the road, attempting to reenter the eastbound lane of travel, when a tractor-trailer operated by Robert Greene struck the McBrides' vehicle in the rear, forcing the front tires to come into contact with the TBD. The McBrides' vehicle was lofted by the impact with the

TBD into the westbound lane of traffic where it was struck by a second tractor-trailer and eventually came to rest in contact with a third tractor-trailer traveling eastbound. Both of the McBrides died in the collision.

On January 12, 1996, the McBrides filed their complaint for personal injuries against Robert Greene, Bob Greene Trucking, Inc., and Rieth–Riley Construction Inc. d/b/a Rieth Riley Construction Co. On August 9, 1996, the McBrides filed an amended complaint adding the State of Indiana and Cole as defendants. In their amended complaint, the McBrides alleged that Cole negligently and recklessly failed to exercise reasonable care and diligence in designing the I–70 construction site. The McBrides also alleged that Cole negligently and recklessly failed to incorporate proper barricades, lights, warning signs, and guards into the design of the I–70 construction site.

On February 26–27, 1998, mediation was conducted. The mediation resulted in a settlement with all parties, except Cole. On October 16, 1998, Cole filed its Motion for Summary Judgment. In its Motion, Cole maintained that it did not design the TBD at issue. Rather, Cole argued that the Indiana Department of Transportation (INDOT) made the decision to use the TBD. Cole alleged that INDOT supplied it with design information, including specifications and drawings, for the TBD. Thus, Cole insisted that all of its work was done under the direction, supervision, and control of INDOT, and was accepted and approved by INDOT. On May 20, 1999, the McBrides filed their response to Cole's Motion for Summary Judgment. A hearing was held on Cole's Motion on October 14, 1999.

1. Appellee's Motion for Oral Argument is denied.

On February 8, 2001, the trial court granted Cole's Motion for Summary Judgment. The trial court, in pertinent part, held as follows:

## FINDINGS OF FACT

\* \* \*

5. In their Complaint, Plaintiffs claim that Cole failed to design the construction site so as to safeguard travelers on I–70, such as the decedents, from harm.

6. On October 25, 1993, two years before the accident, Cole entered into a contract (the Contract) with defendant the Indiana Department of Transportation (INDOT) to provide certain engineering services, including the preparation of contract plans, special provisions for specifications and cost estimates, in connection with an INDOT project to rehabilitate a portion of Interstate 70 in Hancock and Henry Counties (the Project).

7. The Contract provided, among other things, that standard specifications provided by INDOT to Cole were "applicable to the project."

\* \* \*

9. INDOT also gave Cole standard INDOT specifications regarding the use of crossovers for directing traffic from lanes under construction over to the other side of the roadway into lanes normally used by traffic going the other direction. The INDOT standard specifications called for the installation of a temporary bituminous divider (TBD) to separate the opposing lanes of traffic on the side of the roadway in use.

10. Plaintiffs' reference to testimony that not all INDOT standard specifications apply to all projects does not contradict the fact that INDOT supplied certain of its standard specifications, including the TBD specification, to Cole for use on this Project.

11. INDOT also gave Cole a June 18, 1993 memorandum from an INDOT representative directing that "If opposing traffic is to be maintained on one side during construction please contact me for the recommended pavement treatment."

\* \* \*

14. At the time, it was both common industry practice and INDOT's standard policy and practice, based on various considerations including cost, to designate the use of TBD in such projects.

\* \* \*

16. Even if the TBD had only been an INDOT "suggestion" the evidence is undisputed that Cole followed it.

17. INDOT decides what the posted speed through a construction zone will be, and did so on this project as well. INDOT told Cole that the speed limit through the construction zone would be 55 m.p.h. and Cole's design merely incorporated the speed limit mandated by INDOT.

18. Cole relied on INDOT to select an appropriate speed limit.

19. Cole finished its design of the Project and INDOT approved and accepted Cole's design in September 1994.

\* \* \*

## CONCLUSIONS OF LAW

1. Because Cole's design work had been accepted and signed off on by INDOT in 1994, and had been implemented, by the time of the October 1995 accident at issue in this case Cole's duty to third parties as to any negligent errors in its design had been extinguished, unless the design created "a condition

that was dangerously defective, inherently dangerous, or imminently dangerous such that it created a risk of imminent personal injury."

2. Furthermore, even if Cole's design did create a risk of imminent personal injury, Cole still is not liable for injuries to third parties if in creating the design it "merely carried out the plans, specifications, and directions" given to Cole, unless those plans were "so obviously dangerous that no reasonable contractor would follow them." .

3. Based on the undisputed evidence that Cole's design posed no risk of injury to vehicles traveling at or below 45 miles per hour in the construction zone, Cole's design did not create a risk of "imminent personal injury."

4. Even if Cole's design had created a risk of imminent injury, Cole's inclusion of TBD and a 55 mile per hour in its design merely incorporated specifications selected and provided to Cole by INDOT.

* * *

12. Plaintiffs have not presented any credible evidence that could support a conclusion that Cole's design was a proximate cause of the accident or the decedents' deaths.

(Appellant's Brief 26–30) (citations omitted).

The McBrides now appeal.

### DISCUSSION AND DECISION

The McBrides argue that the trial court erred in granting Cole's Motion for Summary Judgment. We disagree.

#### I. *Standard of Review*

The standard of review when reviewing a grant or denial of summary judgment is well-settled. Our standard of review is the same as it was for the trial court: whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Miller v. Grand Trunk Western R.R., Inc.,* 727 N.E.2d 488, 491 (Ind.Ct.App.2000). We must consider the pleadings and evidence designated pursuant to Ind. Trial Rule 56(C) without deciding their weight or credibility. *Id.* Summary judgment should be granted only if such evidence shows that there is no genuine issue of material fact and that judgment is warranted as a matter of law. *Id.*

In this case, the trial court entered specific findings of fact and conclusions of law.

Specific findings and conclusions are neither required nor prohibited in the summary judgment context. Although specific findings aid appellate review, they are not binding on this court. Instead, when reviewing an entry of summary judgment, we stand in the shoes of the trial court.

*Smith v. Allstate Ins. Co.,* 681 N.E.2d 220, 222–223 (Ind.Ct.App.1997) (citations omitted).

#### II. *Independent Contractor*

It is undisputed that Cole was an independent contractor with respect to the design of the project. Generally, an independent contractor does not owe a duty of care to third parties after an owner has accepted the work. *U–Haul Intern., Inc. v. Mike Madrid Co.,* 734 N.E.2d 1048, 1052 (Ind.Ct.App.2000). "As such, evidence of the independent contractor's mere negligence is insufficient to impose liability against the contractor after acceptance of the work by the general contractor or owner." *Id.*

There are several factors in evaluating "acceptance" in this context, including whether:

'(1) the owner or its agent reasserted physical control over the premises or instrumentality; (2) the work was actually completed; (3) the owner expressly communicated an acceptance or release of liability; or (4) the owner's actions permit a reasonable inference that the work was accepted.'

*Id.* (quoting *Blake v. Calumet Const. Corp.*, 674 N.E.2d 167, 171 (Ind.1996)). When considering these factors, "'the focus is on whether the owner was better able than the contractor to prevent injury to third parties at the time the harm occurred.'" *Id.* (quoting *Blake*, 674 N.E.2d at 171).

▆▆▆▆ Furthermore, an exception to the acceptance rule makes an independent contractor liable for injuries to third persons even after the work has been completed and accepted by the owner, where the work was left "'in a condition that was dangerously defective, inherently dangerous or imminently dangerous such that it created a risk of imminent personal injury.'" *Id.* (quoting *Hill v. Rieth–Riley Const. Co.*, 670 N.E.2d 940, 944–945 (Ind. Ct.App.1996)). Liability imposed under this exception is limited where the contractor has merely followed the plans, specifications, and directions provided by the owner. *Id.* Specifically, where an independent contractor is not following his own plans, but those provided by the owner, "'liability is imposed only where the plans are so obviously defective that no reasonable contractor would follow them.'" *Id.* at 1052–1053 (quoting *Ross v. State*, 704 N.E.2d 141, 144 (Ind.Ct.App.1998)).

It is undisputed that Cole's design work had been accepted by the State. Therefore, we must determine whether Cole's work was left "'in a condition that was dangerously defective, inherently dangerous or imminently dangerous such that it created a risk of imminent personal inju-

ry.'" *Id.* (quoting *Hill*, 670 N.E.2d at 944–945).

## A. *Significance of Blake v. Calumet Const. Corp.*

The McBrides argue that in *Blake*, 674 N.E.2d 167, our supreme court set forth a standard of contractor liability to third parties for personal injury after work has been accepted that has since been ignored. We disagree.

The McBrides maintain that the significance of *Blake* is in three footnotes defining the terms "dangerously defective," "inherently dangerous" and "imminently dangerous." These footnotes state as follows:

An independent contractor's work is "dangerously defective" if the work is turned over in a condition that has a propensity for causing physical harm to foreseeable third parties using it in reasonably expectable ways. *See* IND. CODE § 33–1–1.5–2.5 (1993) (defining "defective products" using similar terms); BLACK'S LAW DICTIONARY 418 (6th ed.1990) (defining "defective condition" using similar terms).

Work is "inherently dangerous" if there is "[d]anger inhering in [the] instrumentality or condition itself at all times, so as to require special precautions to prevent injury." BLACK'S LAW DICTIONARY 782 (6th ed.1990). The work as turned over must have been likely to cause harm; a remote chance of injury is insufficient. *Id.* As has been noted, the term "inherently dangerous" is more often used to refer to dangerous activities such as blasting, rather than conditions or instrumentalities, as here. *See Nat'l Steel Erection*, 541 N.E.2d at 292.

Work is "imminently dangerous" if it "is reasonably certain to place life or limb in peril." BLACK'S LAW DIC-

TIONARY 750 (6th ed.1990). "[T]he inquiry must focus on whether the structure if defectively constructed, creates a risk of impending, serious danger." *Nat'l Steel Erection*, 541 N.E.2d at 293. *Id.* at 174 nn. 6–8.

The McBrides seem to think that: 1) it is significant that the *Blake* court listed and defined the above three terms, indicating that they are separate criteria, and although overlapping to some extent, are three discernible conditions under which a contractor's work may be found sufficiently dangerous to impose liability; and 2) other cases have incorrectly focused exclusively on the "inherently dangerous" criteria and by ruling that a condition must be continuously or always dangerous in order to show liability, have heightened the bar for plaintiffs beyond that which is required by *Blake*.

■ We do not deny that *Blake* serves as a good roadmap in cases of independent contractors and injury to third parties. However, we believe that the McBrides have failed to see the overarching point of *Blake*. We find it most significant when the *Blake* court held:

> Plaintiffs must do more than simply plead "dangerously defective," "inherently dangerous" or "imminently dangerous" to avoid summary judgment. Some evidence must be presented tending to show that the work or instrumentality **presented an imminent risk of personal injury to third parties.**

*Id.* at 173 (emphasis added). It is the "imminent risk of personal injury" that we are concerned with. *Id.* The three definitions given by the *Blake* court do not create three separate criteria under which a contractor's work may be found sufficiently dangerous to impose liability. We find that these definitions do, in fact, overlap. The key word in each is "dangerous." In defining each of these terms, our supreme court only emphasized the fact that the work of the independent contractor must be left in a condition that is dangerous in and of itself, such that the work "presented an imminent risk of personal injury to third parties." *Id.* Thus, it is true that the work must be turned over in a condition that is continuously or always dangerous in order to show liability.

### B. *The TBD*

With the above in mind, we turn to the question of whether Cole's traffic maintenance plan for the construction site on I–70, specifically, the TBD, posed a risk of imminent personal injury such that liability may be imposed despite the State's acceptance of those plans. In *U–Haul Intern., Inc.*, 734 N.E.2d at 1054, this court held that:

> "[t]he term 'inherently dangerous' is more properly applied to activities or instrumentalities which are, by their nature, always dangerous, i.e. blasting or wild animals." *Hill*, 670 N.E.2d at 945. Thus, this exception to the acceptance rule applies only to "continuously dangerous activities and instrumentalities." *Id*...

> By its nature, a temporary bituminous divider is a protective device used to separate two-way traffic flow through a construction zone. *See id.* (observing that guardrail is a safety device designated to prevent greater harm from occurring to errant vehicles).

The McBrides infer that the use of TBDs, in general, are dangerous. For example, the McBrides submitted two expert affidavits, both asserting that:

> [TBDs] will not redirect vehicles except at small impact angles and/or low speeds... Except at small impact angles and/or low speeds, the [TBDs] are not very effective in preventing accidents

where the offending vehicle unintentionally crosses the temporary centerline due to driver inattention or sleepiness, loss of control, or vehicle equipment failure... [TBDs] are known to loft vehicles. Loss of contact between the tires and the pavement surface could contribute to the loss of control.

(Appellants' Appendix 113–114; 121–122). The McBrides also submitted an article, which states:

[TBDs] may have both advantages and disadvantages for motorists. From the standpoint of safety, however, there is one distinct difference as compared with a simple lane closure—the potential for a head on collision.

(Appellants' Appendix 132).

■ As this court held in *U–Haul Intern., Inc.,* 734 N.E.2d at 1054, a TBD, by its very nature, is a protective device. We cannot find that the affidavits or article establish that the use of TBDs, in general, are dangerous. The fact that TBDs are not very effective in preventing accidents or that they are known to loft vehicles does not establish that Cole's work was left " 'in a condition that was dangerously defective, inherently dangerous or imminently dangerous such that it created a risk of imminent personal injury.' " *Id.* at 1052 (quoting *Hill,* 670 N.E.2d at 944–945).

### C. The Speed Limit

The McBrides further argue that TBDs used in conjunction with speeds in excess of 45 miles per hour are dangerously defective, inherently dangerous or imminently dangerous, creating a risk of imminent personal injury. This argument fails for several reasons.

First, there was no evidence presented that anyone involved in the accident was traveling over 45 miles per hour. In fact, at the hearing on Cole's Motion for Summary Judgment, the following exchange took place between the trial court, Dawn Wellman (the McBrides' Attorney) and Tom Billings (Cole's Attorney):

THE COURT: Do we know how fast the truck was going when it struck the Plaintiff?

TOM BILLINGS: Plaintiff was going 7 to 15 miles an hour.

THE COURT: I presumed that. But do we know how fast the semi was going? Greene's truck. Is there anything in the designated material?

TOM BILLINGS: I don't know.

THE COURT: Has there been a reconstruction?

DAWN WELLMAN: Yes.

THE COURT: And does reconstruction indicate speed?

DAWN WELLMAN: It—I mean he did go ranges of speeds. I don't know that he did actual speeds.

TOM BILLINGS: It was not a high impact collision.

THE COURT: It wasn't a high speed impact.

DAWN WELLMAN: 37 miles per hour.

THE COURT: Is what the Greene truck was traveling.

DAWN WELLMAN: Right.

(Appellee's Appendix 64). These assertions were not contested.

Next, the McBrides maintain that the Federal Manual on Uniform Traffic Control Devices (FMUTCD) recommends that TBDs should not be used in conjunction with speeds that exceed 45 miles per hour. The FMUTCD states, "[t]he [TBD] *should* only be used on roadways with speeds of 45 mph or less except when recommended by an engineering study." (Appellants' Appendix 188) (emphasis added). While its true that the FMUTCD recommends the use of TBDs in conjunction with

speeds that do not exceed 45 miles per hour, this provision is not mandatory. The FMUTCD provides, in pertinent part, as follows:

**1A–5 Meanings of "Shall," "Should" and "May"**

\* \* \*

1. SHALL–a *mandatory* condition...

2. SHOULD–an *advisory* condition...

3. MAY–a *permissive* condition...

(Appellee's Appendix 67). Therefore, we cannot find that this provision was required.

Third, the McBrides cite Ind.Code § 9–21–5–11, which provides:

(a) Subject to subsection (b), the Indiana department of transportation, the transportation finance authority, and a local authority may establish temporary maximum speed limits in their respective jurisdictions and in the vicinity of a worksite without conducting an engineering study and investigation required under this article. The establishing authority shall post signs notifying the traveling public of the temporary maximum speed limits established under this section.

(b) Worksite speed limits set under this section must be ten (10) miles below the maximum established speed limit. A worksite speed limit may not exceed forty-five (45) miles per hour in any location.

The McBrides contend that Cole did not advise the State that the posted speed should not be in excess of 45 miles per hour. Furthermore, the McBrides argue that the traffic maintenance plan, which was submitted by Cole to the State, was clearly violative of Ind.Code § 9–21–5–

11(b) in that it included the use of the TBD and a speed limit of 55 miles per hour.

In Indiana a non-excused or non-justified violation of a duty prescribed by statute or ordinance is negligence *per se*. *Ray v. Goldsmith*, 400 N.E.2d 176, 178 (Ind.Ct.App.1980). However, "negligence *per se* does not mean liability *per se*, that is, a violation of a statutory duty is not actionable negligence unless it was also the proximate cause of the injury." *Id.* at 179. As previously stated, there is no evidence that anyone involved in the accident was traveling over 45 miles per hour. Thus, even if Cole violated Ind.Code § 9–21–5–11(b), there is no evidence that the violation of this statute was the proximate cause of the accident/injuries.

Finally, regardless of the above discussion, there is no evidence that it was Cole's decision to use a 45 mile per hour speed limit in conjunction with the TBD. Ind.Code § 9–21–5–11(a) allows INDOT, the transportation finance authority, and/or a local authority to establish temporary maximum speed limits in their respective jurisdictions. Furthermore, Cole employee, Paul Hummel (Hummel), at his deposition, testified that INDOT told Cole what the speed limit would be at the I–70 construction site.

Granted, the McBrides argue that the deposition testimony of INDOT employee, Phelps Klika (Klika), contradicts Hummel's testimony. However, we disagree. In their brief, the McBrides state that Klika testified that "there was no communication on the part of INDOT to Cole which recommended or requests [sic] that a speed limit of 55 miles per hour be used in the construction zone." (Appellants' Brief 19). In actuality, Klika was asked: "Is there anything in Plaintiffs' 8 which mandates Cole to accept and utilize the fifty-five mile an hour limit in the work zone?" (Appellants' Appendix 194). Klika

responded: "No." (Appellants' Appendix 194). Thus, all Klika agreed to was the fact that INDOT did not require Cole to accept the suggested speed limit of 55 miles per hour. This does not contradict Hummel's testimony. Moreover, it is clear that mandated or not, Cole was merely following INDOT's suggested 55 mile per hour speed limit.

As previously stated, where an independent contractor is not following his own plans, but those provided by the owner, " 'liability is imposed only where the plans are so obviously defective that no reasonable contractor would follow them.' " *U-Haul Intern., Inc.*, 734 N.E.2d at 1052–1053 (quoting *Ross*, 704 N.E.2d at 144). Here, the McBrides have not rebutted the fact that Cole was simply following IN-DOT's plans to use the 55 mile per hour speed limit in the I–70 construction zone. Furthermore, it has not been shown, nor have the McBrides alleged, that INDOT's plans were so obviously defective that no reasonable contractor would follow them. *Id.*

### CONCLUSION

Based on the foregoing, we find that there are no genuine issues of material fact. *See Miller*, 727 N.E.2d at 491. Therefore, we conclude that the trial court did not err in granting Cole's Motion for Summary Judgment.

Affirmed.

SULLIVAN, J., and FRIEDLANDER, J., concur.