The INDIANAPOLIS–MARION COUNTY PUBLIC LIBRARY, Appellant–Plaintiff,

v.

CHARLIER CLARK & LINARD, P.C., and Thornton Tomasetti Engineers, Appellees–Defendants.

No. 06A05–0804–CV–239.

Court of Appeals of Indiana.

Feb. 6, 2009.

Gregory F. Hahn, Robert S. Daniels, Charles R. Whybrew, Kevin M. Quinn,

Tabbert Hahn Earnest & Weddle LLP, Indianapolis, IN, Attorneys for Appellant.

Gerard L. Gregerson, Karl L. Mulvaney, Brad A. Wilt, Bingham McHale LLP, Indianapolis, IN, Lana L. Dean, Timothy R. Moorhead, Orlando, FL, Attorneys for Appellees Thornton Tomasetti Engineers and Joseph G. Burns.

Thomas D. Collignon, Patrick J. Dietrick, Collignon & Dietrick, PC, Indianapolis, IN, Attorneys for Appellee Charlier Clark & Linard, PC.

## OPINION

BAKER, Chief Judge.

We once again turn the page and delve into another chapter of the saga surrounding the renovation and expansion of the Central Library Project in Indianapolis. Perhaps our discussion below may best be summarized as follows:

> When only economic harm is involved, the question becomes " 'whether the consuming public as a whole should bear the cost of economic losses sustained by those who failed to bargain for adequate contract remedies.' "[1]

And, as New York Court of Appeals Chief Judge Benjamin Cardozo recognized:

> If liability for negligence exists, a thoughtless slip or blunder ... may expose [one] to a liability in an indeterminate amount for an indeterminate time to an indeterminate class.

> . . .

> [I]f there has been neither reckless misstatement nor insincere profession of an opinion, but only honest blunder, the ensuing liability for negligence is one that is bounded by the contract, and is

---

1. *Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc.*, 620 So.2d 1244, 1247 (Fla.1993) (quoting Sidney R. Barrett, Jr., Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis, 40 S.C.L.Rev. 891, 894 (1989)).

to be enforced between the parties by whom the contract has been made. *Ultramares Corp. v. Touche,* 255 N.Y. 170, 179–89, 174 N.E. 441, 444–48 (1931).

Appellant-plaintiff Indianapolis–Marion County Public Library (Library) appeals the trial court's entry of summary judgment in favor of appellees-defendants Charlier Clark & Linard, PC, (CCL), Thornton Tomasetti Engineers (TTE), and Joseph G. Burns (collectively, the appellees). Specifically, the Library argues that the judgment entered for the appellees on its negligence claims was erroneous because those claims were not barred under the economic loss doctrine as espoused by our Supreme Court in *Gunkel v. Renovations, Inc.,* 822 N.E.2d 150 (Ind.2005). Concluding that the trial court properly granted summary judgment for the appellees because the economic loss doctrine precludes the Library from recovering under these circumstances, we affirm.

## FACTS [2]

The Library is a municipal corporation located in Indianapolis. In the late 1990s, the Library approved a plan for the expansion and renovation of its main facility in Indianapolis. The project included (1) the renovation of a building commonly known as the Cret Building; (2) the demolition of a multi-story annex structure; (3) the construction of a six-story tower; (4) the construction of an underground parking garage, which also serves as the structural foundation for the tower; (5) the construction of a new 300-seat auditorium; and (6) the construction of an atrium, which connects the Cret Building and the tower.

In February 1998, the Library engaged Woolen Molzan and Partners, Inc. (WMP),

to serve as architect of record for the project. Thereafter, WMP engaged the services of several consultants, including TTE, which is an international engineering company that is headquartered in New York.[3] WMP ultimately hired TTE to provide structural engineering services for the project.

In July 1999, WMP and TTE entered into a standard architect/consultant agreement. TTE agreed to provide the original structural design for the new and renovated spaces within the project. Among other things, TTE was responsible for providing construction documents, bidding services, and construction phase services. The contract provided in part that

> [TTE] shall not be responsible for the acts or omissions of the Architect, Architect's other consultants, contractor, subcontractors, their agents or employees, or other persons performing any of the Work.

> . . .

> The Architect and [TTE], respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to the Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither Architect nor [TTE] shall assign this Agreement without the written consent of the other.

> . . .

> Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a

---

2. We heard oral argument on December 3, 2008, in Indianapolis. We commend counsel for their able presentations.

3. TTE maintains twelve offices in the United States and offices in London, Moscow, Hong Kong, and Shanghai.

third party against either the Architect or [TTE].

Appellant's App. p. 230, 240. The Library never purchased any services for the project directly from TTE.

Based upon TTE's recommendation, WMP retained CCL, a small civil engineering firm in Indianapolis, to provide certain services relating to the construction of the parking garage. On May 9, 2002, WMP and CCL executed an agreement, pursuant to which CCL agreed to perform twelve site visits to determine whether the project was in general compliance with construction standards. CCL was to be paid $12,000 for its services.

On August 12, 2002, TTE issued final stamped structural design drawings for the project. Burns, who was a managing principal of TTE, affixed his engineer's seal to the designs. Thereafter, the Library and WMP amended the original architect agreement and executed a standard form of agreement. CCL representatives were not made aware of the amendment to the initial agreement. Moreover, although CCL was referenced in the agreement, it was not a signatory to the document. Following the execution of the amended agreement, the Library began awarding contracts to various construction firms.

The Library broke ground on the project on September 27, 2002. The Library subsequently awarded a bid package to Shook, LLC (Shook), for the garage's construction. After TTE provided the structural design of the garage, the Library and Shook contracted for the garage construction, and Shook commenced work on March 17, 2003. Just prior to that date, WMP had issued a proposal request that required substantial modifications to the original drawings that TTE had prepared. Thus, TTE was requested to issue a new set of structural drawings. Among other things, WMP suggested that the concrete strength be increased and that an additional wall be installed.

In response, Shook provided estimates associated with the proposal. Initially, Shook's estimates totaled over $820,000, which required the approval from the Library's Board of Trustees. TTE represented to the Library that the changes set forth in the proposal were necessary to coordinate other bid packages, but Library personnel believed that the proposal was likely an effort to correct deficiencies in the structural design of the garage. However, the Library subsequently approved the proposal on May 28, 2003, and thereafter, Shook reduced its estimate to $518,515.

During the construction process, Shook prepared its own shop drawings, which were based on those of TTE. After the shop drawings were completed, Shook delivered them to the construction manager for the project, Turner Trotter Shiel–Sexton (TTSS), which ultimately submitted them to WMP. WMP then submitted the shop drawings to TTE for review. Following TTE's approval, Shook and the subcontractors followed the drawings and added steel reinforcements to the structural members of the garage.

During construction, Shook and its subcontractors received numerous inquiries regarding placement of the steel reinforcement beams. Those inquiries were submitted to TTE and stemmed from the lack of detail and/or clarity in the drawings. As construction progressed, significant problems developed with the rebar and concrete in the garage. In fact, after the completion of each concrete pour, numerous defects were discovered, including exposed steel reinforcement and voids in the beams and columns.

When CCL first visited the site on August 14, 2003, its personnel had not re-

viewed all of the shop drawings. Thereafter, WMP representatives informed Randy Schmidt and Dennis Bird of CCL that they should perform spot checks on the conventional reinforcing steel placement and focus their attention "on observing post tension tendons." CCL's Br. p. 4. At no time did CCL and the Library directly contract with each other. And, pursuant to the express terms of the WMP–CCL contracts, it was WMP's sole responsibility to provide CCL with all pertinent documents concerning the work that CCL was to observe, including shop drawings, plans and specifications, requests for information, and change orders. Although CCL is an engineering firm, it did not design any engineering works on the project. CCL neither prepared nor issued any engineering drawings, and no one from CCL affixed an engineering stamp to any of the construction or design documents.

Following the initial visit, CCL issued a Construction Observation Report, which described various deficiencies that related to the placement of the steel reinforcements. However, not all of the discrepancies were apparent or visible from the inspections. On August 18, 2003, Bird inspected the steel placement using the shop drawings that TTE had approved three days earlier. Later that afternoon, Bird received a revised set of shop drawings and used those when conducting a subsequent site visit.

On August 22, 2003, WMP and CCL entered into a second agreement, which provided that CCL was responsible for administering various services, including visiting the construction site, reviewing applicable shop drawings, determining if the construction was in general compliance with the construction documents, and preparing construction observation reports within one week of each site visit. Again, at no time did CCL perform engineering

work on the project, and CCL always visited the site when directed to do so by WMP personnel. Neither WMP nor any other entity expressed dissatisfaction with the timeliness, completeness, or form of CCL's observation reports.

In February 2004, approximately one month after completion of the two final major concrete pours, Library personnel discovered major voids in concrete beams and columns in the garage. Thus, the Library became concerned about the structural integrity of the garage and engaged Construction Technologies Laboratories, Inc. (CTL), to conduct a preliminary forensic investigation of the garage. CTL's investigation revealed several construction and design defects in the garage. In fact, CTL representatives believed that the garage may have been "at serious risk for structural failure if construction were allowed to continue." Appellant's App. p. 929. As a result, the Library suspended work on the project on May 6, 2004.

It was determined that fixing the various structural defects would require substantial repairs to the garage, with the vast majority of the columns and beams requiring some level of repair. The Library also had to remove and replace certain items that other contractors and/or subcontractors had installed, including plumbing, electrical, and mechanical work. The project experienced delays due to the defects and repairs, which allegedly resulted in damages and expenses to the Library totaling approximately $40,000,000 to $50,000,000.

On August 27, 2004, the Library filed a complaint against TTE, asserting several counts against it, including one for negligent performance of engineering services. In a letter dated April 20, 2006, the Library formally terminated WMP from the project. Thereafter, WMP informed CCL that it was terminating CCL under their

agreements based upon the Library's cancellation of its contract with WMP. WMP's correspondence regarding the termination of CCL made no mention of any defaults or breaches on CCL's part in its performance of services for WMP under the agreements.

In the first amended complaint, filed on June 2, 2006, the Library added Burns as a party, alleging that TTE negligently performed services on the project and that Burns performed those services in reckless disregard of the consequences to the project. The amended complaint also added CCL as a party and asserted several causes of action against it, alleging that it had negligently performed its services on the project.

In sum, the Library's complaint advanced various claims for breach of contract, negligence and gross negligence, violation of statutory and regulatory duties, fraud, and bad faith. The Library asserted that it sustained the following damages as a result of the appellees' negligence:

a. The costs for materials and equipment related to repair work;

b. The cost of labor for the construction of repairs;

c. Sums dedicated to settlement of numerous delay related claims caused by the sixteen month suspension of construction;

d. Architect and engineering fees incurred as the result of the repair process;

e. Fees incurred as a result of expert analysis;

f. Imposition of additional general conditions;

g. Increased insurance premiums;

h. Cost of utilities;

i. Protracted rental fees for the interim Central Library; and

j. Costs associated with obtaining additional public funding.

Appellant's App. p. 628–85.

Effective August 23, 2006, the Library and WMP entered into a "Settlement Agreement and Release," which included a purported "assignment" by WMP to the Library of WMP's alleged claims against TTE and CCL. Appellees' App. p. 112, 120–30. More particularly, this agreement provided that

> 6. *Assignment of Claims Against Consultants.* [WMP] shall assign to the Library all claims, rights, causes of actions and damages, arising out of contract or tort, which [WMP] may have against any and all [WMP] consultants, including but not limited to, TTE [and] CC & L.... The Library is hereby granted the sole and exclusive right to pursue the claims of [WMP] against [WMP] Consultants, whether in the Library's own name or in the name of [WMP], for the benefit of and at the expense of the Library. Notwithstanding the foregoing, the Library shall not assume any contractual obligations of [WMP] including, without limitation, any contractual obligations to any [consultant] or other third party.

> . . .

> 11. *Limited Indemnification of [WMP].* The Library shall hold harmless and indemnify [WMP] solely against any contractual claims asserted by TTE for additional services fees relating to the Project. Notwithstanding the foregoing, the Library shall not hold harmless or indemnify [WMP] for any other claim or purpose including, without limitation, any other contractual breach claims, tort claims, copyright actions, defamation actions, and/or any other cause of action not expressly covered by the Library's

limited indemnification described in this Paragraph.

*Id.* at 123, 125.

On November 7, 2007, TTE and Burns filed a motion for partial summary judgment, claiming that the Library's causes of action against them were barred as a matter of law by the economic loss doctrine. More particularly, Burns and TTE claimed that they were entitled to summary judgment because the designated evidence established that there had been no personal injury or damage to other property that would permit the Library to maintain a cause of action against them in tort. In other words, Burns and TTE maintained that the Library's damages arose from the project "itself and not from physical damage outside of the Project." Appellant's App. p. 458. CCL subsequently joined in the motion, and, following a hearing on March 7, 2008, the trial court granted the appellees' motion for summary judgment. The trial court determined that the economic loss doctrine barred the Library's negligence claims and entered the following order:

> Indiana law is that damage from an alleged defective service may be recoverable under a negligence theory *if* the alleged defective service caused personal injury or damage to other property, but contract law governs purely economic loss arising from the failure of the service to perform as expected. *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 153 (Ind.2005). "Economic losses" occur when there is no personal injury and no physical harm to other property—these losses are viewed as disappointed contractual or commercial expectations. *Id.* at 153–54. If on the other hand, a plaintiff could show facts or a question of fact as to whether the plaintiff's person or other property was injured or damaged by defendants, summary judgment on

negligence claims would be inappropriate. But, that [the Library] cannot do.

> In this case, the undisputed material facts and the reasonable inferences to be drawn therefrom, show that the losses claimed by the [Library] are commercial losses "best relegated to contract law." *Gunkel,* at 155. These economic or commercial losses include diminution in value of the structure, incidental and consequential losses, lost profits, rental expense, cost of repair and costs of reconstruction. *Id.* at 154. These are the damages claimed by the [Library] against TTE/Burns and CCL for those defendants' alleged negligence, and [the Library] has not met its burden to show damages to "other property" to avoid the bar against purely economic losses in negligence. There is no genuine issue of material fact as to whether [the Library's] damages are anything other than economic losses which are barred from recovery under theories of negligence in Indiana, absent privity.

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that judgment be entered in favor of Defendants TTE and Burns and against [the Library] as to Counts Eight, Ten and Eleven of [the Library's] First Amended Complaint alleging negligence against TTE and Burns. The Court further FINDS and ORDERS that there is no just reason for delay and expressly directs entry of judgment in favor of Defendants Burns and TTE against [the Library] as to Counts Eight, Ten and Eleven of [the Library's] First Amended Complaint forthwith.

> IT IS THEREFORE FURTHER ORDERED, ADJUDGED AND DECREED that judgment be entered in favor of Defendant CCL and against [the Library] as to Count Fifteen of [the Library's] First Amended Complaint al-

leging negligence against CCL. The Court further FINDS and ORDERS that there is no just reason for delay and expressly directs entry of judgment in favor of Defendant CCL and against [the Library] as to Count Fifteen of [the Library's] First Amended Complaint.

Appellant's App. p. 86–89 (emphasis added). The Library now appeals.[4]

### DISCUSSION AND DECISION

#### I. Standard of Review

On appeal, the standard of review of a summary judgment ruling is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Shell Oil Co. v. Lovold Co.*, 705 N.E.2d 981, 983–84 (Ind.1998). All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. *Colonial Penn Ins. v. Guzorek*, 690 N.E.2d 664, 667 (Ind.1997). The review of a summary judgment motion is limited to those materials designated to the trial court. T.R. 56(H); *Rosi v. Bus. Furniture Corp.*, 615 N.E.2d 431, 434 (Ind. 1993). We must carefully review decisions on summary judgment motions to ensure that the parties are not improperly denied their day in court. *Estate of Shebel v. Yaskawa Elec. Am., Inc.*, 713 N.E.2d 275, 277 (Ind.1999). However, we will affirm the grant of summary judgment if it is sustainable on any theory or basis found in the evidentiary matter designated to the trial court. *Stelko Elec., Inc. v. Taylor*

*Cmty. Sch.*, 826 N.E.2d 152, 155 (Ind.Ct. App.2005).

#### II. The Library's Contentions

#### A. General History of the Economic Loss Doctrine and Damage to Property

■ The Library argues that the trial court erred in determining that its negligence claims against the appellees were barred by the economic loss doctrine as a matter of law. More specifically, the Library claims that our courts have not extended the economic loss doctrine to cases in which a plaintiff has a direct claim against a design professional outside the realm of contract, and that the economic loss doctrine does not bar the Library's negligence claims because the appellees' acts and omissions damaged the Library's property and caused an imminent risk of danger to the safety of others. The Library further contends that its negligence claims should proceed because the designated evidence established that the appellees misrepresented certain facts and that the economic loss doctrine does not apply in situations where a defendant provides only services rather than a tangible product.

We initially observe that the economic loss doctrine developed as a way of enforcing the dictates of privity in product liability law and preventing tort remedies from eliminating the customary limitations involved in cases addressing the sale of goods. *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 18 (2d Cir.2000). Over time, some courts expanded application of the economic loss doctrine to areas of tort outside of product liability involving

---

4. As a preliminary matter, we note that on September 25, 2008, the Library filed a motion to strike the appendix that CCL submitted to this court. In support of its motion, the Library asserted that the appendix contains immaterial, impertinent, scandalous, and/or other inappropriate matter. After reviewing the materials contained in the appendix, we reject the Library's contentions and find that the documents are relevant to the issues in this appeal. We therefore deny the Library's motion to strike.

commercial parties and/or individuals. *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo.2004).

 We note that the economic loss doctrine has three general purposes:

(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.

*1325 North Van Buren, LLC v. T–3 Group, Ltd.*, 293 Wis.2d 410, 716 N.W.2d 822, 831 (2006). Additionally:

Contract law rests on obligations imposed by bargain. The law of contracts is designed to effectuate exchanges and to protect the expectancy interests of parties to private bargained-for agreements. Contract law, therefore, seeks to hold commercial parties to their promises, ensuring that each party receives the benefit of their bargain.

. . .

The law of torts, on the other hand, rests on obligations imposed by law. Tort law is rooted in the concept of protecting society as a whole from physical harm to person or property [Citation omitted]. Negligence law ... developed to protect consumers from unreasonably dangerous goods that cause personal injury and damage to other property. It is society's interest in human life, health, and safety that demands protection against defective products, and imposes a duty.

*Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis.2d 395, 573 N.W.2d 842, 846–47 (1998). In essence, the economic loss doctrine recognizes that contracts and torts encompass distinct areas of law that are intended to resolve different types of claims. *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (recognizing that the doctrine seeks to avoid "drowning contract law in a sea of tort").

 In Indiana, an "economic loss" includes consequential losses, such as lost profits, rental expense, diminution in value, and lost time. *Gunkel*, 822 N.E.2d at 154. Moreover, "damage to the product itself, including costs of its repair or reconstruction, is an economic loss even though it may have a component of physical destruction." *Id.* And, even before our Supreme Court's decision in *Gunkel*, this court observed that

Economic loss may be defined as "damages for inadequate value, costs of repair and replacement of the defective product or the consequent loss of profits ... as well as the diminution in the value of the product because it is inferior in quality. To recover in negligence there must be a showing of harm above and beyond disappointed expectations. A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects."

*Jordan v. Talaga*, 532 N.E.2d 1174, 1181 (Ind.Ct.App.1989) (quoting *Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324, 327 (1982)).

 The *Gunkel* court expanded the application of the economic loss doctrine to construction projects and explained that the theory underlying the economic loss rule is that the failure of a product or services to live up to economic expectations is best relegated to contract law or to the law of warranty, where the buyer and seller are able to allocate risks and price the product or service accordingly. 822 N.E.2d at 155. Thus, under the economic

loss doctrine, "contract is the sole remedy for the failure of a product or service to perform as expected." *Id.* at 152. Moreover, this court has held that application of the doctrine in the construction context has resulted in barring tort recovery of economic loss damages from a party involved in a construction project. *See Choung v. Iemma,* 708 N.E.2d 7, 14 (Ind. Ct.App.1999) (holding that a homeowner could not recover under a negligence theory when property damage to a residence that arose from a poorly constructed foundation resulted in only economic losses such as the loss of value to the house and the costs to repair and replace).

Turning to the specific circumstances of *Gunkel,* upon which the Library relies, the evidence established that the plaintiffs contracted with Renovations for construction of a three-story home. Six months later, the Gunkels separately hired J & N Stone to install a stone facade on the exterior of the house. Shortly after that installation, water began seeping through gaps in the facade. The Gunkels claimed that the moisture problems resulted from the leaking façade, which caused damage to the façade and other parts of the house, including the walls, ceilings, floor, drywall, carpet, and carpet padding. The Gunkels sued Renovations, and later added J & N, alleging negligence. Thereafter, J & N moved for summary judgment on the negligence claim because the Gunkels sought only economic damages, which were not available under a negligence theory. *Id.* at 152. The trial court granted summary judgment to J & N on the negligence claim on the grounds that the homeowners' damages were purely economic. Although a panel of this court affirmed, our Supreme Court granted transfer and reiterated Indiana's adherence to the economic loss doctrine in the context of construction claims against non-privity suppliers, but found that *parts* of the damaged house

itself could be considered "other property" because the Gunkels dealt directly with J & N and apart from Renovations. *Id.* at 156.

In discussing whether damage to "other property" had occurred, the *Gunkel* court held that "only the supplier furnishing the defective property or service is in a position to bargain with the purchaser for allocation of the risk that the product or service will not perform as expected." *Id.* at 155. Moreover, it was explained that

> If a component [or service] is sold to the first user as a part of the finished product, the consequences of its failure are fully within the rationale of the economic loss doctrine. It therefore is not "other property." But property acquired separately from the defective good or service is "other property," whether or not it is, or is intended to be, incorporated into the same physical object.

*Id.*

In light of the above, the *Gunkel* court held that "the economic loss rule does not bar recovery in tort for damage that a separately acquired defective product or service causes to other portions or a larger product into which the former has been incorporated." *Id.* at 156. However, *Gunkel* also established that "under the economic loss doctrine, contract is the sole remedy for the failure of a product or service to perform as expected." *Id.* And even though construction claims are not necessarily based on defective goods or products, those actions are subject to the economic loss doctrine. *Id.*

In considering the above, we acknowledge that the circumstances in *Gunkel* are not directly on point with those presented here. However, the facts in this case are analogous to the "typical case" discussed in *Gunkel* where the claim is by a first user of a product that includes a compo-

nent supplied by the defendant with whom the purchaser had no dealings. Here, the appellees were not in privity with the Library. Thus, unlike the circumstances in *Gunkel* where the homeowners contracted directly with the masonry contractor, the Library did not purchase any services directly from the appellees. Indeed, the designated evidence shows that the Library purchased a package through WMP for a design of the entire project that included renovations to the Cret Building, the parking garage, auditorium, atrium, and the tower. Appellant's App. p. 98–99. Thus, the complete design of the projects was the "product" that the Library purchased as the first user. Pursuant to the agreement that TTE executed with WMP, TTE and Burns provided the structural design for the project. As a result, the main product included the component that TTE supplied, i.e., a structural design with which the Library had no direct dealings.

As for the damages that the Library sustained, it is apparent that no damage to tangible property resulted, other than that contained within the scope of the project itself. Most of the damages arose from repairs that were undertaken in the parking garage. Although the repairs have a component of physical destruction, the repair and reconstruction of the garage and other portions of the project are economic losses that arose from the Library's complaint that it did not receive the benefit of its bargain. In other words, the various costs involving the project delay settlements, additional construction management services, extra architectural and engineering services, and legal fees, are all consequential losses that arose from the issues that related to the design and construction of the project. Therefore, it is apparent that the damages claimed by the Library are "economic losses" and are not recoverable in tort.

## B. Exceptions to the Doctrine

Notwithstanding our determination that the Library's damages qualify as economic losses, the Library seeks to distinguish the holding in *Gunkel,* contending that it should be permitted to pursue its negligence claims against the appellees because of certain exceptions to the economic loss doctrine. In particular, the Library points out that some courts have held that the economic loss doctrine does not apply to claims that involve the negligent design of a project or misrepresentations that are made by an engineer or other design professionals. Moreover, the Library points out that some cases have permitted negligence claims to proceed in the construction context in instances in which the defendant has created a condition that was imminently or inherently dangerous. Finally, the Library asserts that the economic loss doctrine should not apply where services, rather than products, are provided.

### 1. Design Claims and Privity

The Library attempts to distinguish the holding in *Gunkel* because it brought design claims against the appellees, which are not merely breach of contract actions under a construction agreement. The Library points out that its claims are based on the appellees' failure to fulfill their professional duties to the Library to perform design services in conformance with applicable standards of care. As a result, the Library argues that *Gunkel,* "at most, applies the economic loss doctrine to construction activities, not design activities." Appellant's Br. p. 40.

The Library notes that TTE, Burns, and CCL did not build the parking garage and that it was not in direct privity with any of them. Thus, the Library asserts that the result reached by courts from other jurisdictions should control; namely, that the economic loss doctrine applies only when the parties are in privity with each other.

Moreover, the Library asserts that its negligence claims should be allowed to proceed because a structural engineer owes professional duties that are akin to those owed by other professionals, including attorneys, accountants, physicians, construction managers, and real estate agents.

Because of the dearth of Indiana authority regarding certain exceptions to the economic loss doctrine, the Library relies extensively on a Florida case, *Moransais v. Heathman*, 744 So.2d 973 (Fla.1999), for the proposition that its negligence action against "professionals," such as the appellees, should not be barred under the economic loss doctrine. The *Moransais* court observed that

> We agree with the observations of those who have noted that because actions against professionals often involve purely economic loss without any accompanying personal injury or property damage, extending the economic loss rule to these cases would effectively extinguish such causes of action. This is not what the court had in mind many years ago when it applied the economic loss rule....
>
> Accordingly, we hold that the economic loss rule does not bar a cause of action against a professional for his or her negligence even though the damages are purely economic in nature.... We also hold that Florida recognizes a common law cause of action against professionals based on their acts of negligence despite the lack of a direct contract between the professional and the aggrieved party.

*Id.* at 983–84.

■■ Notwithstanding the Library's assertion and its reliance on *Moransais*, the claim brought by the Library against the appellees with whom it was not in privity is precisely the type of action that Indiana law does not support. As explained in *Gunkel*:

> Indiana law under the Products Liability Act and under general negligence law is that damage from a defective product or service may be recoverable under a tort theory if the defect causes personal injury or damage to other property, but contract law governs damage to the product or service itself and purely economic loss arising from the failure of the product or service to perform as expected.

822 N.E.2d at 155. Moreover, as our Supreme Court observed in *Reed v. Central Soya Co.*, 621 N.E.2d 1069, 1074–75 (Ind. 1993): "Where the loss is solely economic in nature, as where the claim of loss relates to the product's failure to live up to expectations, and in the absence of damage to other property or person, then such losses are more appropriately recovered by contract remedies." Finally, this court has observed that

> " '[W]here there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule ... that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery. W. Prosser, Handbook on the Law of Torts, Section 101 at 665 (4th Ed.1971).' "

*Choung*, 708 N.E.2d at 13 (quoting *Jordan v. Talaga*, 532 N.E.2d 1174, 1181 (Ind.Ct. App.1989)).

■ As discussed above, the plaintiffs in *Gunkel* and in this case brought negligence claims against the respective defendants. The homeowners in *Gunkel* sought the costs associated with repairs to the home, while the Library seeks, among other things, the costs associated with the repairs to its parking garage. Here, the Library points out that it did not contract

directly with any of the appellees, arguing that the holding in *Gunkel* dictates that the economic loss doctrine should apply only in cases where the parties are in privity. Notwithstanding this contention, this court has recognized that third parties, not in privity with a professional, cannot recover in negligence unless there are either recognized exceptions or certain conditions exist. *See U–Haul Int'l, Inc. v. Mike Madrid Co.*, 734 N.E.2d 1048, 1056 (Ind.Ct.App.2000) (holding that an engineer could not be held liable to a third party in a wrongful death action when it was shown that the engineering plans did not pose a risk of imminent personal injury); *Hiatt v. Brown*, 422 N.E.2d 736, 740 (Ind.Ct.App.1981) (observing that recovery for personal injury by a third party against an architect was barred unless it was established that the architect created a condition that was imminently dangerous). These holdings are consistent with *Gunkel* because the plaintiff-homeowners in that case were in privity with the defendant-masonry company that caused the damage. Hence, the homeowners were permitted to recover the damages that resulted to "other property" that arose from the masonry company's negligence. In other words, in accordance with *Gunkel*, if there is no privity, the economic loss doctrine applies and a third party's claim against a professional is not favored absent a risk of imminent danger or personal injury.[5]

To further illustrate, we note that in *2314 Lincoln Park West Condominium Ass'n v. Mann*, 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346 (Ill.1990), a condominium association sought to recover the costs of making certain repairs to the building where the units were located. The case involved a negligence claim brought against a design professional arising from defects in construction, and the parties were not in privity with each other. The association sued the developer, the developer's general partner, the management company, the general contractor on the project, the roofing contractor, and the architectural firm that designed the project. *Id.* at 346–47, 144 Ill.Dec. 227, 555 N.E.2d 346. The developers had contracted with the architect who had developed the plans and specifications for the work. The association alleged that numerous defects in the design and construction of the project had become known to the unit owners, which included windows and glass doors that had loosened, roof leaks, and faulty heating and cooling systems. There was no personal injury or claim of damage to anything other than the building itself. *Id.* at 351, 144 Ill.Dec. 227, 555 N.E.2d 346. The trial court dismissed all counts except for the negligence claim against the architect on the basis that the economic loss doctrine barred recovery. On appeal, it was determined that no exception to the economic loss doctrine applied because the gravamen of the claim was for dissatisfaction with the way that the building was designed and constructed. *Id.* at 352–53, 144 Ill.Dec. 227, 555 N.E.2d 346. Indeed, the *2314 Lincoln Park* court applied the economic loss doctrine to the costs of repairs to the structure because the defendant-design professional was sued in tort by a plaintiff who was not in privity with the professional. We agree with that rationale and find that it supports the trial court's conclusion that the economic loss doctrine barred the Library's negligence claims against the appellees.

### 2. Imminent Risk of Danger— Physical Harm

■ Even though the Library was not in privity with the appellees, the Library

---

5. The concepts of "imminent danger" and "personal injury" with regard to the economic loss doctrine are discussed in the next section.

asserts that the economic loss doctrine should not apply in these circumstances because the designated evidence established that the appellees created a condition that was imminently or inherently dangerous. In support of its claim, the Library points out that CTL representatives believed that the parking garage may have been "at serious risk for structural failure if construction were allowed to continue." Appellant's App. p. 929. Because of this risk, the Library asserts that it should not have to wait for such injury to result before pursuing tort claims against the appellees.

■ We note that an exception to the economic loss doctrine arises in the absence of privity when an architect creates a condition that is imminently dangerous to third persons and injury has resulted. *Hiatt,* 422 N.E.2d at 740. However, there is no exception to the economic loss doctrine that permits recovery in negligence—absent privity—when there has been no physical injury or damage to property. *U-Haul,* 734 N.E.2d at 1056; *see also Bamberger & Feibleman v. Indianapolis Power & Light Co.,* 665 N.E.2d 933, 938 (Ind.Ct.App.1996) (observing that when a negligence action is premised on the failure of a product to perform as expected, economic losses are not recoverable unless such failure also causes personal injury or physical harm to property other than to the product itself; thus, the plaintiff law firm could not prevail on a negligence claim for lost profits from lost billable hours following a power outage because the firm could not show the physical harm necessary to recover under that theory).

As discussed above, the undisputed facts demonstrate that there was no accident, injury, or collapse of any structure on the property. Rather, the designated evidence shows that the damage to the Library occurred during the course of construction. Hence, the destructive testing on the structures and removal of work that was already in place were not natural occurrences of sudden harm caused by the defective design. Rather, the only damages claimed by the Library are for the costs to repair the construction defects and all of the consequential losses that arose from those defects. Appellant's App. p. 634. Thus, in response to the Library's question as to whether it "should ... have waited until a catastrophic failure occurred and someone was seriously injured" prior to suing the appellees in *negligence,* appellant's br. p. 56, the answer is "yes." In our view, without recognizable personal injury or property damage, the fact that the Library made repairs to insure the structural integrity of the building is not relevant to the Library's negligence claims.

By the same token, we fully embrace the notion that these circumstances did not compel the Library to remain idle until a catastrophic event occurred before repairing the structure and suing those who owed it contractual duties to build and design the project in a proper manner. This is precisely what the Library did when it pursued breach of contract actions against the various defendants, ultimately settling with WMP and the general contractor.

Based on the foregoing, it is apparent that the appellees satisfied their burden in demonstrating that the economic loss doctrine barred recovery because of the Library's inability to show the requisite harm necessary to proceed on its negligence claims. Hence, the imminent danger exception to the economic loss doctrine does not apply in these circumstances, and the trial court properly concluded that that the Library sustained losses that are best relegated to recovery under contract law.

### 3. Misrepresentation of Facts

Although we have concluded that the trial court properly applied the economic loss doctrine in barring the Library's negligence claims against the appellees, the Library nonetheless maintains that those claims should proceed under a "negligent misrepresentation" exception to the doctrine. Appellant's Br. p. 65–66. More specifically, the Library argues that the designated evidence establishes that the appellees negligently conveyed false and/or misleading information to it about the project during the shop drawing process and meetings that took place at the parking garage construction site.

The Library points out that "most" of the jurisdictions that have adopted the negligent misrepresentation exception to the economic loss doctrine follow the Restatement (Second) of Torts, section 552 (1976), which provides that

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance on the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

We initially observe that Indiana has not expressly adopted section 552 of the Restatement. However, the Library directs us to *Thomas v. Lewis Eng'g, Inc.*, 848 N.E.2d 758 (Ind.Ct.App.2006), where this court determined that a professional may be liable to a third party where the professional has actual knowledge that the third party would rely on the professional's opinion or service. *Id.* at 762. In light of this rationale, the Library maintains that the negligent misrepresentation exception to the economic loss doctrine is relevant

because the Library relied on initial incorrect design drawings and the statements that TTE and Burns made regarding proposed changes to construction when making decisions regarding construction. The Library also contends that CCL provided false information to the Library on several occasions when it failed to note readily apparent defects and deficiencies to the garage structure. As a result, the Library asserts that because the deficiencies to the structure could have been remedied if they had been disclosed prior to the concrete pours, the appellees' alleged negligent misrepresentations precluded the entry of summary judgment.

The Library correctly observes that a number of jurisdictions have recognized the negligent misrepresentation exception to the economic loss doctrine. *See In re Chicago Flood Litig.*, 176 Ill.2d 179, 223 Ill.Dec. 532, 680 N.E.2d 265, 275 (1997); *Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 584 (Ky. 2004); *Ossining Union Free Sch. Dist. v. Anderson*, 73 N.Y.2d 417, 541 N.Y.S.2d 335, 539 N.E.2d 91, 94 (1989); *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270 (2005); *John Martin Co., Inc. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 434 n. 1 (Tenn.1991); *Bay Garden Manor Condo. Ass'n, Inc. v. James D. Marks Assoc., Inc.*, 576 So.2d 744, 746 (Fla.Ct.App.1991); *Nota Constr. v. Keyes Assoc., Inc.*, 45 Mass.App.Ct. 15, 694 N.E.2d 401, 405 (1998); *Davidson and Jones, Inc. v. County of New Hanover*, 41 N.C.App. 661, 255 S.E.2d 580, 584–85 (1979). However, the Library directs us to no authority, and we have found none, recognizing that a claim of negligent misrepresentation may be raised to prevent the economic loss doctrine from applying to traditional negligence claims. Indeed, in *Thomas v. Lewis Engineering*, we observed that negligent misrepresentation is

an independent tort, which is premised on section 522 of the Restatement of Torts. 84 N.E.2d at 760–61. When considering this rationale and the fact that the Library did not sue on a negligent misrepresentation theory, this exception to the economic loss doctrine is inapplicable here.

### 4. Services v. Tangible Product

■ Finally, the Library maintains that the economic loss doctrine does not apply "where a defendant provides solely services and not a tangible product." Appellant's Br. p. 67. The Library points out that none of the appellees actually constructed the garage and that they provided only services, including the design drawings and suggestions relating to how the construction should proceed. Therefore, the Library maintains that the economic loss doctrine does not foreclose its negligence claims against the appellees.

Notwithstanding the Library's contention, it has provided no basis under Indiana law and has presented no analysis as to why a "services only" exception to the economic loss doctrine should apply here. In fact, such a notion is contrary to the holding in *Gunkel*, and, as discussed above, we determined in *Bamberger* that the doctrine applied to negligence claims when the supply of electrical services was at issue. 665 N.E.2d at 933. As a result, the Library's contention that "services" are not subject to the economic loss doctrine fails.

### CONCLUSION

In light of our discussion above, we conclude that the negligence claims that the Library brought against the appellees are subject to the economic loss doctrine and are "best relegated to contract law" in accordance with *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150 (Ind.2005). Moreover, the purported exceptions to the economic loss doctrine do not apply. As a result, the trial court properly entered summary judgment for the appellees on the Library's negligence claims.

The judgment of the trial court is affirmed.

BAILEY, J., concurs.

BROWN, J., concurring in part and dissenting in part with opinion.

BROWN, Judge, concurring in part and dissenting in part.

I respectfully concur as to the majority's conclusion that summary judgment was properly entered in favor of CCL. However, I disagree with the majority's conclusion that summary judgment based on the economic loss doctrine was appropriate as to TTE.

*Gunkel* and most of the cases cited by the majority are distinguishable because they did not involve professional services arising outside of contract. Specifically, I find *Gunkel* distinguishable because the "product or service" at issue was the façade added to the exterior of the plaintiffs' home and not an engineering or design claim. *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 156 (Ind.2005), *reh'g denied*, Most of the cases cited by the majority also did not involve a claim of professional error. *See Reed v. Central Soya Co. Inc.*, 621 N.E.2d 1069, 1071 (Ind.1993) (addressing claims of contaminated feed), *modified on other grounds* by 644 N.E.2d 84 (Ind. 1994); *Choung v. Iemma*, 708 N.E.2d 7, 14 (Ind.Ct.App.1999) (addressing the plaintiff's claims that the defendants "negligently constructed the foundation of the house, together with the garage floor, drainage for the footers, and the septic system"), *reh'g denied*; *Jordan v. Talaga*, 532 N.E.2d 1174, 1181 (Ind.Ct.App.1989) (addressing a claim of negligence against a developer of land), *reh'g denied, trans. de-*

*nied;* and *Bamberger & Feibleman v. Indianapolis Power & Light Co.,* 665 N.E.2d 933, 938 (Ind.Ct.App.1996) (noting that the factual basis for the plaintiffs' claims rested upon the failure to deliver electricity).

The majority cites two cases that involve a claim against a professional for the proposition that a physical injury is necessary. Specifically, the majority notes that "an exception to the economic loss doctrine arises in the absence of privity when an architect creates a condition that is imminently dangerous to third persons and injury has resulted." Op. at 813 (relying on *Hiatt v. Brown,* 422 N.E.2d 736, 740 (Ind. Ct.App.1981)). The majority also holds that there is no exception to the economic loss doctrine that permits recovery in negligence "when there has been no physical injury or damage to property." Op. at 813 (relying upon *U-Haul Intern., Inc. v. Mike Madrid Co.,* 734 N.E.2d 1048, 1056 (Ind.Ct.App.2000)). I cannot conclude that these cases require a personal injury merely because they involved personal injuries and did not address a situation in which the risk of imminent danger exists but personal injury has not in fact resulted. *See U-Haul,* 734 N.E.2d at 1050–1051 (noting that the case involved a wrongful death suit); *Hiatt,* 422 N.E.2d at 737 (noting that the case involved serious personal injuries). Further, the court in *Hiatt* did not explicitly require a physical injury, but rather held that "[i]n this state, the privity barrier has repeatedly collapsed if it is established that the architect's design was done so negligently as to create a condition imminently dangerous to third persons." 422 N.E.2d at 740. The court in *U-Haul* did not mention the economic loss doctrine but addressed the acceptance rule,[6] *see* 734 N.E.2d at 1052, which has since been abandoned. *See Peters v. Forster,* 804 N.E.2d

736, 743 (Ind.2004) (abandoning the acceptance rule in favor of traditional principles of negligence). Thus, I do not believe that *U-Haul* or *Hiatt* require the application of the economic loss doctrine.

However, I do find *Hiatt* instructive in its above-cited language that "[i]n this state, the privity barrier has repeatedly collapsed if it is established that the architect's design was done so negligently as to create a condition imminently dangerous to third persons." *Hiatt,* 422 N.E.2d at 740. Here, the Library designated evidence that "the Parking Garage may have been at serious risk of structural failure if construction were allowed to continue." Appellant's Appendix at 929. The Library also designated evidence that it had "significant concerns over the structural integrity of the Parking Garage and the safety of continued construction on the Project." *Id.* at 911. Given this evidence, I conclude that there is at least a question of fact as to whether TTE created a condition imminently dangerous to third persons. However, CCL's minor part in the process did not create a condition imminently dangerous to third persons. As the majority noted, at no time did CCL perform engineering work on the project and because of its very limited role, I would affirm the trial court's grant of summary judgment to CCL.

TTE is a design professional and structural engineering firm which potentially created a condition imminently dangerous to third persons. TTE owed a duty to the Library to make sure that its design was sound and would adequately support the parking garage and building. This duty did not arise in contract and precludes the application of the economic loss doctrine. *See Webb v. Jarvis,* 575 N.E.2d 992, 996

---

6. The acceptance rule provided that an independent contractor did not owe a duty of care to third parties after an owner accepted the work. *U-Haul,* 734 N.E.2d at 1052.

(Ind.1991) (addressing a negligence claim against a doctor, a professional, and holding that the imposition of a duty should not be dependent upon the nature of the damages, i.e., whether the damages are personal injury or economic, which flow as a result of its breach); *Runde v. Vigus Realty, Inc.*, 617 N.E.2d 572, 575 (Ind.Ct.App. 1993) (holding that the economic loss doctrine did not apply to the plaintiffs' claim for negligence which was based upon the alleged negligent performance of a duty undertaken by a gratuitous agent); *A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, 114 P.3d 862, 865 (Colo.2005) (concluding that the economic loss doctrine has no application because the plaintiff's negligence claim was based on a recognized independent duty of care); *Eastern Steel Constructors, Inc. v. City of Salem*, 209 W.Va. 392, 549 S.E.2d 266, 275 (2001) (holding that a design professional has a duty of care to a contractor in the absence of privity and that the contractor may recover purely economic damages in an action alleging professional negligence on the part of the design professional); *Moransais v. Heathman*, 744 So.2d 973, 983–984 (Fla.1999) (holding that the economic loss rule does not bar a cause of action against a professional engineer for his or her negligence even though the damages are purely economic), *reh'g denied; Tommy L. Griffin Plumbing & Heating Co. v. Jordan; Jones & Goulding, Inc.*, 463 S.E.2d 85, 89 (S.C.1995) (holding that an engineer owed a duty to the contractor not to negligently design or negligently supervise the project and that the economic loss doctrine did not prohibit the plaintiff from maintaining a suit in tort for purely economic losses).

The economic loss doctrine is based upon the distinction between contract and tort claims. *Bamberger & Feibleman v. Indianapolis Power & Light Co.*, 665 N.E.2d 933, 938 (Ind.Ct.App.1996) (relying upon *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078 (Ind.1993), *reh'g denied, abrogated in part on other grounds by Hyundai Motor America, Inc. v. Goodin*, 822 N.E.2d 947 (Ind.2005)). This court has held that "[t]he theory of negligence protects interests related to safety or freedom from physical harm." *Jordan v. Talaga*, 532 N.E.2d 1174, 1181 (Ind.Ct.App.1989), *trans. denied.* The Library designated evidence that "the Parking Garage may have been at serious risk of structural failure if construction were allowed to continue." Appellant's Appendix at 929. The Library also designated evidence that it had "significant concerns over the structural integrity of the Parking Garage and the safety of continued construction on the Project." *Id.* at 911.

The majority relies upon *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346 (1990). In that case, the court stressed that the claim at issue concerned the "quality, rather than the safety, of the building and thus [was] a matter more appropriately resolved under contract law." *Id.* Here, the Library has raised issues about the safety of the parking garage. Thus, I find *2314 Lincoln Park* distinguishable.

Because the theory of negligence protects interests related to safety and there is at least a question of fact regarding imminent danger as to TTE, summary judgment based on the economic loss doctrine was inappropriate.

For the foregoing reasons, I would reverse the trial court's grant of summary judgment in favor of TTE and affirm the summary judgment in favor of CCL.