ATTORNEYS FOR APPELLANT
Gregory F. Hahn
Robert S. Daniels
Charles R. Whybrew
Kevin M. Quinn
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
CHARLIER CLARK & LINARD, P.C.
Thomas D. Collignon
Patrick J. Dietrick
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
THORNTON TOMASETTI ENGINEERS AND
JOSEPH G. BURNS
Gerard L. Gregerson
Karl L. Mulvaney
Brad A. Wilt
Indianapolis, Indiana

Timothy R. Moorhead
Lana L. Dean
Orlando, Florida

ATTORNEYS FOR AMICUS CURIAE
AMERICAN COUNCIL OF ENGINEERING
COMPANIES
Gregory P. Cafouros
Andrew R. Falk
Indianapolis, Indiana

# In the
# Indiana Supreme Court

**FILED**
Jun 29 2010, 1:03 pm

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

No. 06S05-0907-CV-332

INDIANAPOLIS-MARION COUNTY
PUBLIC LIBRARY,

*Appellant (Plaintiff below),*

v.

CHARLIER CLARK & LINARD, P.C.,
THORNTON TOMASETTI ENGINEERS
AND JOSEPH G. BURNS

*Appellees (Defendants below).*

Appeal from the Boone Circuit Court, No. 06C01-0406-PL-336
The Honorable Matthew C. Kincaid, Judge

**June 29, 2010**

**Sullivan, Justice.**

The Indianapolis-Marion County Public Library ("Library") seeks to hold two subcontractors and an engineer responsible for negligence in rendering their respective services during the renovation and expansion of its downtown Indianapolis library facility. In accord with the analysis of the trial court and Court of Appeals, we affirm the trial court's dismissal of the Library's claims of negligence against the defendants. Primarily because the Library is connected with the defendants through a network or chain of contracts in which the parties allocated their respective risks, duties, and remedies, those contracts, and not negligence law, govern the outcome of the Library's claims.

## Background

The Library hired Woollen Molzan and Partners, Inc. ("WMP") to serve as the architect for the renovation and expansion of many structures contained in the Library's downtown Indianapolis facility, including its parking garage. WMP then subcontracted with Thornton Tomasetti Engineers ("TTE") and Charlier Clark and Linard, P.C. ("CCL") to perform architectural and engineering services. Joseph G. Burns ("Burns"), a managing principal of TTE, served as "engineer of record" for the library project. Specifically, TTE performed structural engineering services and CCL administered various services for the project including reviewing and inspecting the construction plans and construction progress to determine if construction was in general compliance with the construction documents. The Library never contracted directly with TTE, CCL, or Burns for any services during the renovation and expansion project, but each was a party to one or more contracts with WMP or other entities involved in the project.[1] We will refer to TTE, CCL, and Burns collectively as the "Defendants" in this opinion.

---

[1] The parties contest in separate litigation whether the Library has contract claims against one or more of the Defendants. Indianapolis-Marion County Pub. Library v. Charlier Clark & Linard, P.C., – N.E.2d –, No.

According to the Library, after construction of the project had progressed significantly, it became concerned about the structural integrity of the accompanying parking garage, which was to serve as the foundation for the rest of the library structure. The Library hired an expert who confirmed that there were several construction and design defects in the Library parking garage. The expert advised that the garage would be at serious risk for structural failure if construction were to continue. The Library suspended construction and took steps to mitigate the effects of the negligent design. The Library maintains that curing the defects and their effects caused it to sustain damages of approximately $40 to $50 million, as follows:

        (1)     costs for materials and equipment related to repair work;
        (2)     costs of labor for construction repairs;
        (3)     sums dedicated to the settlement of numerous delay claims caused by the sixteen month suspension of construction;
        (4)     architect and engineering fees incurred as a result of the repair process;
        (5)     fees incurred as a result of expert analysis;
        (6)     imposition of additional general conditions;
        (7)     increased insurance premiums;
        (8)     cost of utilities;
        (9)     protracted rental fees for the interim Central Library; and
        (10)    costs associated with obtaining additional public funding.

(Appellant's Br. at 22-23.)

The Library brought a lawsuit against WMP, TTE, Burns, CCL, and Shook, LLC (the general contractor), an insurance company, and other contractors working on the project alleging negligent failure to perform engineering, administrative, and design work in a skillful, careful, workmanlike manner along with breach of contract claims with the parties with whom the Library had a contractual relationship. The Library sought to recover damages for repair costs, project delay settlements, expert fees, utilities, rental fees, increased insurance premiums, and costs associated with seeking additional public funding. The Library eventually settled with WMP and Shook, the two parties with whom it had a contractual relationship, for an undisclosed amount.

---

06A05-0906-CV-327 (Ind. Ct. App. June 28, 2010). At issue in the case before us is only whether, as a matter of law, the Defendants have liability in tort. Nothing in this decision should be read as expressing any opinion on the viability of any contract claims.

The Defendants then moved for partial summary judgment, arguing that the negligence claims against them were barred by the so-called "economic loss rule." The trial court agreed and granted the Defendants' motions for partial summary judgment. The Court of Appeals affirmed, Indianapolis-Marion County Public Library v. Charlier Clark & Linard, P.C., 900 N.E.2d 801 (Ind. Ct. App. 2009). Judge Brown dissented as to one Defendant, believing that partial summary judgment should not have been entered in favor of TTE. Id. at 817-19 (Brown, J., dissenting). The Library sought, and we granted, transfer, thereby vacating the opinion of the Court Appeals. Ind. Appellate Rule 58(A).

**Discussion**

Under long-standing Indiana law, a defendant is liable to a plaintiff for the tort of negligence if (1) the defendant has a duty to conform its conduct to a standard of care arising from its relationship with the plaintiff, (2) the defendant failed to conform its conduct to that standard of care, and (3) an injury to the plaintiff was proximately caused by the breach. Estate of Heck ex rel. Heck v. Stoffer, 786 N.E.2d 265, 268 (Ind. 2003).[2] Consistent with this principle, where the injury to the plaintiff is from a defective product or service (as the Library alleges here), the defendant is liable under a tort theory if the defect causes personal injury or damage to property other than the product or service itself. Gunkel v. Renovations, Inc., 822 N.E.2d 150, 153 (Ind. 2005).[3] However, Indiana cases go on to hold that the defendant is not liable under a tort theory for any purely economic loss caused by its negligence (including, in the case of a defective product or service, damage to the product or service itself). Id.[4] This rule precluding tort liability for

---

[2] Cf. Faris v. Hoberg, 134 Ind. 269, 274-275, 33 N.E. 1028, 1029-31 (1893) (same elements except no reference to cause being "proximate").

[3] For a similar formulation of this principle, see Restatement (Third) of Torts: Products Liability § 21 (1998). "For purposes of this Restatement, harm to persons or property includes economic loss if caused by harm to: (a) the plaintiff's person; or (b) the person of another when harm to the other interferes with an interest of the plaintiff protected by tort law; or (c) the plaintiff's property other than the defective product itself." Id.

[4] Cases in this genre include Gunkel, 822 N.E.2d 150; Fleetwood Enters., Inc. v. Progressive N. Ins. Co., 749 N.E.2d 492 (Ind. 2001); Progressive Ins. Co. v. General Motors Corp., 749 N.E.2d 484, 491 (Ind. 2001); Martin Rispens & Son v. Hall Farms, Inc., 621 N.E.2d 1078 (Ind. 1993); Reed v. Cent. Soya Co., Inc., 621 N.E.2d 1069 (Ind. 1993), modified on other grounds, 644 N.E.2d 84 (Ind. 1994).

4

purely economic loss – that is, pecuniary loss unaccompanied by any property damage or personal injury (other than damage to the product or service itself) – has become known as the "economic loss rule" and its applicability is the central issue in this appeal.

In this opinion, we will first examine the history of the economic loss rule in Indiana and its rationale. We will then turn to the Library's contentions that the economic loss rule does not apply in this case because the Defendants' alleged negligence caused (A) damage to what is called in this context "other property" and (B) imminent risk of personal injury. Third, we will address the Library's policy arguments that the economic loss rule should not be applied here because (A) the Defendants are professionals, (B) they allegedly negligently misrepresented facts to the Library, and (C) they provided solely services and not tangible products.

# I

## A

A recent project of the American Law Institute ("ALI") focusing on the economic loss rule has produced some detailed and highly illuminating materials on this subject.[5] In discussing the history of the rule, Professor Mark P. Gergen of the University of Texas School of Law, the project's reporter, wrote that the "economic loss rule emerged alongside the modern negligence action" as courts wrestled with whether plaintiffs could bring "negligence claims for solely pe-

---

[5] This project was commissioned by the ALI in 2005 to restate existing common law into a series of principles or rules as it relates to economic torts and the economic loss rule. Two drafts were submitted to the ALI's governing Council addressing the economic loss rule, but no part of the work was approved by the ALI. To accompany the ALI project, Professor Ellen M. Bublick organized a symposium, the "Dan B. Dobbs Conference on Economic Tort Law," at the University of Arizona James E. Rogers College of Law. The symposium papers are published in 48 Ariz. L. Rev. 693 et seq. Work on the ALI project was suspended in December 2007 following Professor Mark P. Gergen's resignation as reporter. The ALI Reporter (Winter 2008), http://www.ali.org/_news/reporter/winter2008/10_ALI_Torts.htm (last visited March 14, 2010). Recently, Professor Ward Farnsworth of Boston University School of Law was named to succeed Prof. Gergen as reporter. See http://www.ali.org/index.cfm?fuseaction=projects.members&projectid=15 (last visited Apr. 23, 2010).

cuniary harm." Restatement (Third) of Economic Torts and Related Wrongs § 8, Reporter's Note a (Council Draft No. 2, 2007) [hereinafter Gergen Restatement Draft[6]].

Gergen Restatement Draft § 8, cmt. a, reports that explicit references to the "economic loss rule" began to appear in case law in the early 1980s. Consistent with this trend, the first decision under Indiana law holding that a defendant could not be held liable under a tort theory for any purely economic loss caused by its negligence came in 1984. A plaintiff had sought to recover lost profits allegedly caused when it was unable to use in its business defective trucks manufactured by defendant. Sanco, Inc. v. Ford Motor Co., 579 F. Supp. 893 (S.D. Ind. 1984), aff'd, 771 F.2d 1081 (7th Cir. 1985). Judge Dillin concluded that Indiana would not permit the recovery of economic loss in a negligence action. Id. at 896-99.

Soon thereafter, the Court of Appeals followed suit in a decision written by Judge Robertson. The plaintiff in Prairie Production, Inc. v. Agchem Division-Pennwalt Corp. had sought damages for lost profits allegedly caused by the defendant's negligence in manufacturing a pesticide that had failed to protect the plaintiff's crop from infestation. 514 N.E.2d 1299, 1304 (Ind. Ct. App. 1987). Employing an analysis similar to Sanco, the court held that a plaintiff could not recover economic losses in the form of lost profits when the alleged economic loss flows from the failure of a product to perform as expected. Id. at 1304.

In two decisions – one responding to a negligence claim and the other to a products liability claim – written by Justice Krahulik, this Court recognized the economic loss rule as well. In Martin Rispens & Son v. Hall Farms, Inc., the plaintiff's negligence claim alleged defendant had marketed infected seeds that failed to perform as expected, leaving plaintiff with a damaged crop that resulted in lost profits. 621 N.E.2d 1078 (Ind. 1993). Citing Prairie Production, we held that "[t]he general rule in Indiana is that where a negligence claim is based upon the failure of a product to perform as expected and the plaintiff suffers only economic damages, no recovery may be had in negligence; instead, the buyer's remedy lies in contract." Id. at 1089-90. In Reed

---

[6] We refer to Restatement Council Draft No. 2 as the "Gergen Restatement Draft" in this opinion because the Council Draft produced by Professor Gergen was not acted upon by the ALI. As discussed in note 5, supra, Professor Gergen has resigned as reporter and has been succeeded by Professor Farnsworth who may take a different approach to the project.

v. Central Soya Co., Inc., the plaintiff's products liability claim alleged damages caused by their dairy cattle having eaten contaminated feed manufactured and sold by the defendants. 621 N.E.2d 1069, 1070 (Ind. 1993). We wrote that where loss is solely economic in nature, i.e., where there was no damage to other property or person, "such losses are more appropriately recovered by contract remedies." Id. at 1075.

Our most recent pronouncement on the subject was in an opinion written by Justice Boehm:

> Indiana law under the Products Liability Act and under general negligence law is that damage from a defective product or service may be recoverable under a tort theory if the defect causes personal injury or damage to other property, but contract law governs damage to the product or service itself and purely economic loss arising from the failure of the product or service to perform as expected.

Gunkel, 822 N.E.2d at 153.[7]

## B

A review of the case law and ALI materials suggests several principal justifications for the economic loss rule.

First, the economic loss rule reflects that the resolution of liability for purely economic loss caused by negligence is more appropriately determined by commercial rather than tort law. As noted at the very outset of this Discussion supra, the economic loss rule provides that a defendant is not liable under a tort theory for any purely economic loss caused by its negligence (including, in the case of a defective product or service, damage to the product or service itself) –

---

[7] Gunkel is a particularly important precedent for resolving the case before us because it involved a claim for negligence arising in the context of a construction project (as opposed to the products liability context of Reed, Martin Rispens, Prairie Production, and Sanco). In doing so, it is directly relevant to at least two of the Library's arguments – that the economic loss rule is not applicable in this case because the damages it suffered were damages to what is referred to in economic loss rule parlance as "other property" and that the economic loss rule should not be applied to damages from services negligently performed. Both of these arguments will be discussed infra. See Parts II-A, III-C.

but that a defendant is liable under a tort theory for a plaintiff's losses if a defective product or service causes personal injury or damage to property other than the product or service itself. The Seventh Circuit has written that

> [i]t would be better to call ["an economic loss"] a "commercial loss," not only because personal injuries and especially property losses are economic losses, too – they destroy values which can be and are monetized – but also, and more important, because tort law is a superfluous and inapt tool for resolving purely commercial disputes. We have a body of law designed for such disputes. It is called contract law. Products liability law has evolved into a specialized branch of tort law for use in cases in which a defective product caused, not the usual commercial loss, but a personal injury to a consumer or bystander.

Miller v. U.S. Steel Corp., 902 F.2d 573, 574 (7th Cir. 1990) (Posner, J.).[8]

Among the first and best known articulations of this justification came in Seely v. White Motor Co., 403 P.2d 145 (Cal. 1965). The plaintiff had sought to recover lost profits and a refund of the purchase price of a defective truck. The Supreme Court of California ruled that such damages, although recoverable in a breach of warranty action, were not recoverable in strict liability in tort. Explaining the court's decision, Justice Traynor identified warranty law rather than tort law as establishing the appropriate rules for recovery for economic loss. A manufacturer "can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm[,]" Traynor wrote. Id. at 151. But the manufacturer "cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." Id.

In a similar vein, Reed explained that a tort remedy was inferior to commercial law "where the loss is solely economic in nature." 621 N.E.2d at 1074-75. A "dissatisfied buyer

---

[8] Gunkel "agree[d] with the Seventh Circuit that 'economic loss' is not a helpful term in understanding the [economic loss] doctrine" but went on to say that "[d]espite its imprecision, the term 'economic loss' has been adopted by courts in this and most other jurisdictions and we use it here with the caveat that it does not necessarily lead to a proper understanding of the scope and applicability of the doctrine." 822 N.E.2d at 152. The Gergen Restatement Draft uses the expression "pecuniary harm" in this regard. Gergen Restatement Draft § 8.

may avail himself of those statutory remedies fashioned by the legislature" in Article 2 of the Uniform Commercial Code, we said. Id. at 1075. This is superior to "[a]llowing a buyer to recover in tort where he has suffered only economic loss," we continued, because recovery in tort would allow "him to circumvent the seller's effective limitation or exclusion of warranties under the UCC, and subject[ ] manufacturers to liability for damages of unknown and unlimited scope." Id.

This justification for the economic loss rule is clearly implicated by the case before us. From the outset of the project, the Library looked to a series of contracts to establish the relative expectations of the parties. And reliance on contract law in this regard is perhaps greater in construction projects than any other industry, as will be discussed at greater length in part III-A infra of this opinion. At the same time, the Library emphasizes that it did not have any bilateral contractual relationship with any of the Defendants – that it was not in "privity of contract" with them – and forcefully challenges the applicability of the economic loss rule in the absence of privity, as too will be discussed in part III-A infra.

A second justification for the economic loss rule is that "[l]iability should not be imposed when it creates a potential for liability that is so uncertain in time, class, or amount that [a defendant should not] fairly or practically be expected to account for the potential liability when undertaking the conduct that gives rise to" it. Gergen Restatement Draft § 8, cmt. d(2). This justification is implicated "when an accident causing physical harm has significant far-flung economic consequences." Id. § 8, cmt. b. It is also the focus of attention in claims of accountant liability and, more generally, negligent misstatement, "because of the ease of transmitting information that appears to invite a recipient's reliance." Id. § 8, cmt. d(2).

The rationale for this justification is that tort law ought not expose a defendant guilty of mere negligence "to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." Ultramares Corp. v. Touche, 174 N.E. 441, 444 (N.Y. 1931) (Cardozo, C.J.). Chief Judge Cardozo's aphorism has been relied upon by the Court of Appeals on a number of occasions. See, e.g., Thomas v. Lewis Eng'g, Inc., 848 N.E.2d 758, 761 (Ind. Ct. App. 2006) (no claim for negligent misrepresentation against surveyor not in privity of contract with plaintiff);

9

Essex v. Ryan, 446 N.E.2d 368, 373 (Ind. Ct. App. 1983) (no claim for negligence against surveyor not in privity of contract with plaintiff). Cf. First Cmty. Bank & Trust v. Kelley, Hardesty, Smith & Co., 663 N.E.2d 218, 224 (Ind. Ct. App. 1996) (limiting Ultramares to cases where "non-contractual, non-assignee parties seek redress").

This second justification for the economic loss rule is not directly implicated by the case before us. While the damages are large, they are by no means indeterminate. Nor is there any exposure to the Defendants for an indeterminate time or to an indeterminate number of plaintiffs.

The discussion supra clearly demonstrates that the economic loss rule is well established in Indiana and that there are sound legal and economic justifications for it. But we emphasize before going further that the economic loss rule has limits, that while it operates as a general rule to preclude recovery in tort for economic loss, it does so only for purely economic loss – pecuniary loss unaccompanied by any property damage or personal injury (other than damage to the product or service provided by the defendant) – and even when there is purely economic loss, there are exceptions to the general rule.

These two limitations on the economic loss rule – that there (1) must be purely economic loss for it to apply and (2) are some exceptions to its application even where there is purely economic loss – provide the bases for the Library's five arguments that the economic loss rule is inapplicable in this case and that the Library should be allowed to proceed in tort against the Defendants. The Library makes two arguments that it has not suffered purely economic loss; these are discussed in Part II infra. And the Library makes three arguments that even if it has suffered purely economic loss, three exceptions apply; these are discussed in Part III infra.

**II**

The Library's principal contention is that its loss is not "pure" economic loss and thus that its tort claims against the Defendants are not precluded by the economic loss rule. Specifically, the Library maintains that the damages it suffered were (A) to "other property" and (B)

10

physical, not commercial, and even if not physical, should be treated as such because they created an imminent risk of personal injury.

## A

The economic loss rule is only implicated where a plaintiff has suffered "pure economic loss." As we have already discussed, "pure economic loss" means pecuniary harm not resulting from an injury to the plaintiff's person or property. The Library contends that the nature of its losses take this case outside the economic loss rule. This requires that we return to the corollary to the economic loss rule at issue in Gunkel: the so-called "other property rule."

Gunkel and the cases preceding it made clear that "contract law governs damage to the product or service itself and purely economic loss arising from the failure of the product or service to perform as expected." Gunkel, 822 N.E.2d at 153. However – and this is the "other property rule" – "damage from a defective product or service may be recoverable under a tort theory if the defect causes personal injury or damage to other property." Id. (emphasis added).

Gunkel went on to explore in some detail "what constitutes 'other property[.]'" Id. at 154. "[W]e align[ed] ourselves with the courts that have concluded that the 'product' is the product purchased by the plaintiff, not the product furnished by the defendant." Id. at 155. Thus, the question is what "product" the Library purchased, because

> [o]nly the supplier furnishing the defective property or service is in a position to bargain with the purchaser for allocation of the risk that the product or service will not perform as expected. If a component is sold to the first user as a part of the finished product, the consequences of its failure are fully within the rationale of the economic loss doctrine. It therefore is not "other property."

Id. Here the Library purchased a complete refurbishing of its library facility from multiple parties. The Library did not purchase a blueprint from the Defendants, concrete from the materials supplier, and inspection services to ensure the safety of the construction project in isolation; it purchased a complete renovation and expansion of all the components of its facility as part of a single, highly-integrated transaction. Thus, irrespective of whether Defendants' negligence was

11

the proximate cause of defects in the design of the library facility, for purposes of the other property rule, the product or service that the Library purchased was the renovated and expanded library facility itself.

Gunkel's analysis is the same as the Gergen Restatement Draft's:

> [W]hen the defective property provided by the [defendant] physically harms other property of the [plaintiff], and that other property was not provided by the [defendant] in the same transaction as the defective property, such physical harm is a basis for a negligence, strict liability, or products action to recover for the physical harm and the resulting pecuniary harm. Properties that are provided by [a defendant] in the same transaction as part of an integrated whole generally are treated as a single property for this purpose.

Gergen Restatement Draft § 8 cmt. c(2). This is also the case when services are provided:

> When a service provider is responsible for a leak and physical defect in property, physical impairment of the property resulting from the defect is not physical harm to that property or to other property that is part of an integrated whole with that property.

Id. § 8 cmt. c(3).

In Gunkel, the plaintiff had contracted with a corporation other than the defendant to build an entirely new home. The plaintiff then contracted in a separate transaction with the defendant to attach a stone façade to the new home. We concluded that the "product or service purchased" from the defendant was the façade added to the exterior of the plaintiff's home by the defendant "under an arrangement with the [plaintiff] that was independent of the contract with [the other corporation] to build the home." 822 N.E.2d at 156. The economic loss rule precluded tort recovery for damage to the façade itself, but the other property rule did permit tort recovery for damage to the home, and its parts, caused by the allegedly negligent installation of the façade. Id. at 156-57. The contrast with this case is clear. Here the product or service purchased from the Defendants was an integral part of the entire library construction project, not independent from it. Any damages alleged to have resulted from the Defendants' negligence were to the "product" the Library purchased, not to "other property." The economic loss rule applies.

12

**B**

The Library also argues that its claims are not governed by the economic loss rule because the damages it suffered were physical, not commercial, and even if not physical, should be treated as such because they presented the imminent risk of personal injury.

Contending that having to repair and reconstruct a substantial portion of the project was tantamount to suffering property damage, the Library argues that it suffered damages distinct from commercial losses such that the economic loss rule is not applicable. Had the Library suffered property damage to "other property," the economic loss rule would not apply and the Library would be entitled to recover in tort for the pecuniary harm attributable thereto. But our resolution of the Library's contention on "other property" in subpart A <u>supra</u> disposes of this contention as well. As the Court of Appeals correctly stated, "[a]lthough the repairs have a component of physical destruction, the repair and reconstruction of the garage and other portions of the project are economic losses that arose from the Library's complaint that it did not receive the benefit of its bargain." <u>Indianapolis-Marion County Pub. Library</u>, 900 N.E.2d at 812. This is also the view of many of our sister jurisdictions.[9]

---

[9] <u>See, e.g.</u>, <u>Nastri v. Wood Bros. Homes, Inc.</u>, 690 P.2d 158 (Ariz. Ct. App. 1984) (cracks in the kitchen floor, the vinyl floor, family room floor, and bedroom floor, and buckling of the roof all involved damages to the structure itself; therefore, only economic losses were presented and owners could not sue in tort); <u>Danforth v. Acorn Structures, Inc.</u>, 608 A.2d 1194 (Del. 1992) (a homeowner who brought a tort action against the seller of a building kit for negligent design could not recover because deterioration of windows, door frames, and exterior siding was strictly economic loss); <u>Casa Clara Condo. Ass'n v. Charley Toppino & Sons, Inc.</u>, 620 So. 2d 1244 (Fla. 1993) (homeowners could not recover in tort for defective cracked and broken concrete); <u>Redarowicz v. Ohlendorf</u>, 441 N.E.2d 324 (Ill. 1982) (homeowner who sought recovery for costs of repair and replacement of a defectively constructed chimney suffered only economic losses and claims are not properly addressed by tort law); <u>Calloway v. City of Reno</u>, 993 P.2d 1259 (Nev. 2000), <u>overruled on other grounds by</u> <u>Olson v. Richard</u>, 83 P.3d 31 (Nev. 2004) (en banc) (economic loss rule precluded a homeowner association from suing for defective roofing and siding causing water damage); <u>Chenango County Indus. Dev. Agency v. Lockwood Greene Eng'rs</u>, 114 A.D.2d 728 (N.Y. App. Div. 1985) (building owners could not sue roofing material manufacturer in tort for cracks, splits, and leaks in the roof because owners only suffered economic loss); <u>Am. Towers Owners v. CCI Mech.</u>, 930 P.2d 1182 (Utah 1996) (where the only damages complained of were repair costs and diminution of property values, the economic loss rule barred the condominium association's claims for negligent construction).

The Library further argues for a narrow construction of the economic loss rule where an imminent risk of danger implicates safety concerns for the public. Specifically, the Library argues that safety is more the concern of tort rather than breach of contract, and the proper redress for negligent design is tort. We acknowledge that in some cases, including the Library's situation, the absence of personal harm is a matter of fortune and future events could have resulted in personal injury had the Library not acted first to remedy the hazards posed by the faulty design and construction of the library facility. However,

> [t]he distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumers' demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.

Seely v. White Motor Co., 403 P.2d at 151, quoted in Martin Rispens, 621 N.E.2d at 1090.

In Progressive Insurance Co. v. General Motors Corp., 749 N.E.2d 484 (Ind. 2001), when confronted with interpreting the scope of the Indiana's Products Liability Act for damage to the product itself, we explicitly declined a request to "allow a claim where 'the absence of personal injury is merely fortuitous, such as when an object explodes but does not inflict personal injuries on anyone.'" Id. at 490-91 (following East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 870 (1986)).[10] "If such a position is to be adopted, that is for the legislature to do and not this Court." Id. at 491. We adhere to the Progressive precedent in the context of today's

---

[10] Although the Library does not rely on it, we acknowledge Hiatt v. Brown's observation that "[i]n this state, the privity barrier has repeatedly collapsed if it is established that [an] architect's design was done so negligently as to create a condition imminently dangerous to third persons." 422 N.E.2d 736, 740 (Ind. Ct. App. 1981). That having been said, in both Hiatt and all the cases it cites, the plaintiffs actually suffered serious personal injury.

case.  On the facts of this case, we hold that the economic loss rule applies notwithstanding the presence of imminent risk of danger.

## III

The Library argues that even if we conclude that it  suffered purely economic loss (as we have just done in part II, supra), three policy considerations dictate that its negligence claims not be precluded by the economic loss rule: (A) the Defendants are professionals; (B) the Defendants negligently misrepresented facts to the Library; and (C) the Defendants provided solely services and not a tangible product.

### A

The Library argues that as a matter of policy, the economic loss rule should not be applied to engineers and design professionals, whether or not in privity of contract with a plaintiff. To be sure, certain professionals – lawyers being the prime example – are liable in tort for negligence that causes purely economic loss, whether or not in privity of contract with a plaintiff. The Library argues that tort liability on the part of any professional who owes a duty of care outside of contract should not be precluded by the economic loss rule.  And because engineers and design professionals (as are the Defendants here) owe such a duty of care, the Library maintains, tort liability on their part should not be precluded by the economic loss rule.

### A-1

In support of this proposition, the Library quotes one of our decisions to the effect that design professionals have a duty of care "to all those who may foreseeably be injured" when a structure is negligently designed or when a dangerous condition is not disclosed.  (Br. of Appellant at 43) (quoting Peters v.  Forster, 804 N.E.2d 736, 742 (Ind.  2004)).  It also cites a decision of the Court of Appeals for the same proposition.  Id. at 44 (citing Strauss Veal Feeds, Inc. v.

Mead & Hunt, Inc., 538 N.E.2d 299 (Ind. Ct. App. 1989), trans. denied). Neither Peters nor Strauss Veal Feeds supports the Library's position.[11]

More to the point are a series of decisions from other jurisdictions that the Library says hold that the economic loss rule does not apply to negligence actions against engineers and other design professionals.[12] For purposes of our analysis, we divide these cases into two categories: cases where the plaintiffs seeking to recover in tort were in privity of contract with the defendants and cases where they were not.

A common thread in the "privity" cases that allow negligence claims to proceed even though contract claims exist is the respective courts' view that the gravamen of the complaint is as much malpractice as it is breach – and that tort is regularly deployed to remedy malpractice.[13] We respectfully disagree with the conclusion in these cases. For over a generation, Indiana law has recognized the applicability of the economic loss rule to those who supply a defective prod-

---

[11] It is true that Peters stands for the proposition that design professionals can be held liable in tort even though not in privity of contract. But Peters involved a claim by a plaintiff who suffered serious personal injury. Peters, 804 N.E.2d at 737. The case did not discuss or even implicate purely economic loss. Strauss Veal Feeds contradicts the Library's position. Plaintiff in that case brought a breach of contract action against an architect it had engaged to design a plant for part of its agricultural business. The plaintiff also brought a negligence claim against the defendant for failure to warn the plaintiff about potential waste disposal problems. The Court of Appeals held that the architect had no duty to warn and that the architect was bound to perform with reasonable care only those obligations for which he had contracted. Strauss Veal Feeds, 538 N.E.2d at 303.

[12] The Library cites eight cases in this regard. One simply recites that courts in other states have held that the economic loss rule does not apply to negligence actions against engineers and other design professionals, see Dep't of Natural Res. v. Transamerica Premier Ins. Co., 856 P.2d 766, 772 (Alaska 1993); it makes no holding of its own to that effect.

[13] See Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 18 (2d Cir. 2000) ("[T]he better course is to recognize that the [economic loss] rule allows such recovery in the limited class of cases involving liability for the violation of a professional duty. To hold otherwise would in effect bar recovery in many types of malpractice actions."); (17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n of Am., 693 N.Y.S.2d 554, 560 (N.Y. App. Div. 1999) "[T]he fact that [plaintiff] suffered pecuniary losses only is of no significance in this malpractice claim against a professional[.]"). The Library spends the most time discussing Moransais v. Heathman, where the court allowed the plaintiffs to proceed against individual employees of an engineering firm with whom the plaintiffs had a contract, holding that "[t]he [economic loss rule] rule, in any case, should not be invoked to bar well-established causes of actions in tort, such as professional malpractice." 744 So.2d 973, 983 (Fla. 1999). The Gergen Restatement Draft takes the position that Moransais was wrongly decided. § 12 cmt. c(2), illus. 12, and Reporter's Note c(2).

16

uct or service pursuant to contract, and we believe that the policy reasons set forth in this opinion amply justify application of these precedents to engineers and design professionals. As the Arizona Supreme Court recently observed, "the policy concerns that justify applying the doctrine to construction defect cases do not justify distinguishing between contractors on the one hand and design professionals, including architects, on the other." Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc., 223 P.3d 664, 673 (Ariz. 2010).[14] To the same effect, the Nevada Supreme Court has held,

> We perceive no significant policy distinction that would drive us to permit tort-based claims to recover economic losses against design professionals, such as architects and engineers, who provided their professional services in the commercial property development and improvement process, when we have concluded that such claims are barred under the economic loss doctrine if brought against contractors and subcontractors involved in physically constructing improvements to real property.

Terracon Consultants W., Inc. v. Mandalay Resort Group, 206 P.3d 81, 89 (Nev. 2009).

The second category of cases cited by the Library – where the plaintiffs are not in privity of contract with the defendant design professionals – focus on the privity requirement. In one of these cases, the plaintiff was a "contractor" and the defendant was a "design professional"; the remaining facts are sketchy. The court held that public policy dictated that privity needed to yield to protect "innocent third parties who suffer economic loss."[15] The other privity cases share a common fact pattern. In each, a school corporation solicited competitive bids based on a common set of plans and drawings prepared for the school by an architect. The successful bidder experienced cost overruns or pecuniary loss, allegedly as a result of defects in the plans and drawings and sought to recover from the architect in tort. The respective courts allowed the

---

[14] In rejecting an argument that providing architects the protection of the economic loss rule would also shield lawyers and fiduciaries from malpractice liability, the Arizona court found malpractice claims distinct because of lawyers' and fiduciaries' fiduciary duties to their clients and because lawyers and fiduciaries generally are barred from entering agreements that prospectively limit their liability. Flagstaff Affordable Hous., 223 P.3d at 673. Cf. the malpractice observations made by the cases cited in note 13, supra.

[15] Conforti & Eisele, Inc. v. John C. Morris Assocs., 418 A.2d 1290, 1291-92 (N.J. Super. Ct. Law Div. 1980).

claims to proceed, in each case invoking § 552 of the Restatement (Second) of Torts ("Informa-tion Negligently Supplied for the Guidance of Others").[16] (We will discuss Restatement § 552 in Part III-B infra in connection with the Library's negligent misrepresentation claim against the Defendants.)

We recognize that there are situations where it would be unjust not to allow plaintiffs to proceed in tort against an engineer or design professional for purely economic loss where no contract exists nor could exist between the parties. We need not decide today whether the plain-tiff in Peters would have been allowed to recover had he suffered purely economic loss; it is suf-ficient to say that we would consider whether such a claim should be recognized as an exception to the general economic loss rule. Said differently, our default position in Indiana is that in gen-eral, there is no liability in tort for pure economic loss caused unintentionally.[17] But Indiana courts should recognize that the rule is a general rule and be open to appropriate exceptions, such as (for purposes of illustration only) lawyer malpractice, breach of a duty of care owed to a plain-tiff by a fiduciary, breach of a duty to settle owed by a liability insurer to the insured, and negli-gent misstatement.[18]

## A-2

We find that none of the Library's authority involves a major construction project owner seeking to recover in tort from engineers or design professionals with whom the project owner, though not technically in privity of contract, is connected through a network or chain of contracts

---

[16] Donnelly Constr. Co. v. Oberg/Hunt/Gilleland, 677 P.2d 1292, 1296-97 (Ariz. 1984); Hewett-Kier Constr., Inc. v. Lemuel Ramos & Assocs., 775 So. 2d 373, 374-75 (Fla. Dist. Ct. App. 2000); Bilt-Rite Contractors, Inc. v. Architectural Studio, 866 A.2d 270, 286-87 (Pa. 2005).

[17] Arizona appears to take a different approach in this regard. Instead of using the economic loss rule as its default position in respect of non-contracting parties, it directs Arizona courts to "focus on whether the applicable substantive law allows liability in the particular context." Flagstaff Affordable Hous., 223 P.3d at 673.

[18] The general rule of Gergen Restatement Draft § 12 provides: "[A person] is subject to liability in tort for pure economic loss resulting from the [person's] negligent performance of a contract in cases of: (a) professional malpractice; (b) breach of a duty of care owed to the claimant by an agent, fiduciary, bailee, or common carrier in supplying information or rendering a service; (c) breach of the duty to settle owed by a liability insurer to the insured; and (d) negligent misstatement."

among the owner, contractors and subcontractors, engineers and design professionals, and others in which they allocate their respective risks, duties, and remedies. We believe that the reasons for applying the economic loss rule to all participants in such a network or chain of contracts in a major construction project are compelling, whatever that rationale might be for not applying the economic loss rule to design professionals in other settings or contexts.

Our analysis starts with the general applicability of the economic loss rule in the construction context. Gunkel was a construction case and the opinion makes clear that the economic loss rule extends beyond the products liability context of cases like Sanco, Prairie Production, Martin Rispens, and Reed. "Construction claims are not necessarily based on defective goods or products, but nonetheless are subject to the economic loss doctrine. In general, a claim that a product or service did not perform as expected is best left to contract law remedies." Gunkel, 822 N.E.2d at 155. As we observed in Gunkel, "The central theory underlying 'economic loss' is that the law should permit the parties to a transaction to allocate the risk that an item sold or a service performed does not live up to expectations." Id.

The Arizona Supreme Court recently gave extended treatment to the justification for applying the economic loss rule in the construction context. In a case much like the one before us, the plaintiff project-owner argued that it should be allowed to proceed in tort against a project's architect. But the court said:

> The economic loss doctrine appropriately applies in this context [construction defect cases] because construction contracts typically are negotiated on a project-specific basis and the parties should be encouraged to prospectively allocate risk and identify remedies within their agreements. These goals would be undermined by an approach that allowed extra-contractual recovery for economic loss based not on the agreement itself, but instead on a court's post hoc determination that a construction defect posed risks of other loss or was somehow accidental in nature.

Flagstaff Affordable Hous., 223 P.3d at 670.

More generally, the roles of the participants in a major construction project vary with the type of construction contract, and "the particular contract chosen will determine the role the de-

19

sign professional will play and the risks and liabilities to be assumed." Design Professionals Handbook of Business and Law 461 (Robert F. Cushman & James C. Dobbs eds., 1991). "In the context of larger construction projects, multiple parties . . . typically rely on a network of contracts to allocate their risks, duties, and remedies[.]" BRW, Inc. v. Dufficy & Sons, Inc., 99 P.3d 66, 72 (Colo. 2004). When parties are connected through a chain of contracts, as in the construction context, courts should defer to the language of the contracts governing their relationship. Id.; Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd., 929 P.2d 1228 (Wyo. 1996). Such a rule promotes private ordering by respecting a commonly understood allocation of risk even though the relevant term may or may not be in a contract. As one commentator has stated:

> Perhaps more than any other industry, the construction industry is vitally enmeshed in our economy and dependent on settled expectations. The parties involved in a construction project rely on intricate, highly sophisticated contracts to define the relative rights and responsibilities of the many persons whose efforts are required–owner, architect, engineer, general contractor, subcontractor, materials supplier–and to allocate among them the risk of problems, delays, extra costs, unforeseen site conditions, and defects. Imposition of tort duties that cut across those contractual lines disrupts and frustrates the parties' contractual allocation of risk and permits the circumvention of a carefully negotiated contractual balance among owner, builder, and design professional. Indeed the right of the parties to make their own bargain as to economic risk is impaired.

Sidney R. Barrett, Jr., Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis, 40 S.C. L. Rev. 891, 941 (1989) (citations and internal quotation marks omitted). Thus, whether an architect or engineer owes any duty to the employees of independent contractors on a construction site – to prepare competent plans and specifications, to supervise the implementation of such plans and specifications properly, and to supervise the conduct of work methods with reasonable care – is to be determined from the various contracts governing them and from the actual conduct of the architect or engineer. Walters v. Kellam & Foley, 172 Ind. App. 207, 360 N.E.2d 199 (1977), trans. denied.

One treatise on construction law has explained why the economic loss rule is particularly applicable in the construction setting:

> The Construction Process with its wealth of participants, its overlapping functions, and unclear lines of responsibility, makes it unlikely that expansion of professional liability will place responsibility on the party on whom it ought to be placed. . . . It must be kept in mind that the party who has suffered economic losses usually can transfer such losses to the party with whom it has contracted – . . . the contractor to the owner.

Legal Aspects of Architecture, Engineering, and the Construction Process 314 (Justin Sweet ed., 1994). In its brief to this court, amicus notes that the parties can provide contractually for additional costs necessitated by changed specifications or unforeseen conditions, as such eventualities occur frequently in construction work. (Amicus Curiae Br. at 8.) Indeed, we made this very point in the warranty context in Progressive: "The consumer may bargain for a warranty, or choose to pay less and forego a warranty. . . . Presumably the cost of that additional exposure on the part of the manufacturer will be built into its pricing over time." 749 N.E.2d at 489. The concepts of shifting and sharing the risk of loss are equally applicable to the construction industry where the provision of professional design services is implicated. For example, Legal Aspects of Architecture, supra, sets forth a variety of techniques through which parties to a construction project can manage risk, such as indemnity, performance and payment bonds, and professional liability insurance. It also discussed what it refers to as "contractual risk control" by means of clearly demarcating the scope of services each party will provide, the standard of performance, and exclusion of consequential damages. Similarly, Judge Posner has described several strategies that businesses use to minimize their risk of economic losses – minimizing inventory, adopting corporate forms that provide for discharge of debt through bankruptcy, purchasing insurance, and self-insuring. Richard A. Posner, Common-Law Economic Torts: An Economic and Legal Analysis, 48 Ariz. L. Rev. 735, 738 (2006).

At the risk of belaboring the point, we observe that the Library itself has demonstrated total familiarity with these techniques of risk allocation in its Architect Contract with WMP. (Appellant App. at 272, 292, 327, 365-66, 393.) In addition, the Library's contract with Shook, the general contractor of the project who participated in the construction of the parking garage, contained specific provisions that allocated responsibility for uncovering and correcting work that did not conform to the contract documents. Id. at 365-66. And its contract with Patriot Engineering, another contractor for the project, charged Patriot with the task of "perform[ing] testing

and inspection services . . . for the Project with the objective of obtaining quality construction and timely completion of the Project[.]" Id. at 393.

We conclude with two cases from other jurisdictions holding that the economic loss rule precludes participants in major construction projects connected through a network or chain of contracts from proceeding against each other in tort for purely economic loss.

In Rissler, the Wyoming Supreme Court held that the economic loss rule prohibited a general contractor from proceeding in negligence against a project engineer. 929 P.2d at 1235. Acknowledging that the plaintiff contractor and defendant engineer were not in privity of contract, the court nevertheless held that the plaintiff "had the opportunity to allocate the risks associated with the costs of the work when it contracted with the [project owner] and, in fact, entered into a detailed contract which allowed it the means, method and opportunity to recover economic losses allegedly caused by [defendant's] negligence." Id. at 1235. In doing so, the Wyoming court followed an influential decision of the Washington Supreme Court, Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 881 P.2d 986, 992-993 (Wash. 1994). In that case, the Washington Supreme Court had held that a general contractor could not recover purely economic damages in tort from an architect, an engineer, and an inspector, none of whom were in privity of contract with the general contractor:

> If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity. The construction industry in particular would suffer, for it is in this industry that we see most clearly the importance of the precise allocation of risk as secured by contract. The fees charged by architects, engineers, contractors, developers, vendors, and so on are founded on their expected liability exposure as bargained and provided for in the contract. . . .
>
> A bright line distinction between the remedies offered in contract and tort with respect to economic damages also encourages parties to negotiate toward the risk distribution that is desired or customary. We preserve the incentive to adequately self-protect during the bargaining process. If we held to the contrary, a party could bring a cause of action in tort to recover benefits they were unable to obtain in contractual negotiations.

Id. at 992-93 (citations omitted).

22

The Colorado Supreme Court also relied on <u>Berschauer</u> in resolving <u>BRW</u> where a subcontractor on a construction project sued both the engineering firm that designed the plans and specifications for the project and an entity performing project inspection and management functions. The plaintiff sought to recover in tort purely economic losses it allegedly incurred as the result of defendants' negligence in design and inspection. 99 P.3d at 67. Apparently the subcontractor was not in privity of contract with the defendants, but the project was controlled by a "network of contracts" that had been "entered into by commercial parties capable of contractually protecting their respective economic expectations." <u>Id.</u> at 71. We quote the Colorado court at some length because of the relevance of its analysis to the case before us:

> In the context of larger construction projects, multiple parties are often involved. These parties typically rely on a network of contracts to allocate their risks, duties, and remedies:
>
>> [C]onstruction projects are multiparty transactions, but rarely is it the case that all or most of the parties involved in the project will be parties to the same document or documents. In fact, most construction transactions are documented in a series of two-party contracts, such as owner/architect, owner/contractor, and contractor/subcontractor. Nevertheless, the conduct of most construction projects contemplates a complex set of interrelationships, and respective rights and obligations . . . .
>
> <u>Fundamentals of Construction Law</u> 4-5 (Carina Y. Enhada et al., eds., 2001).
>
> In such a contract chain, the parties do have the opportunity to bargain and define their rights and remedies, or to decline to enter into the contractual relationship if they are not satisfied with it. Even though a subcontractor may not have the opportunity to directly negotiate with the engineer or architect, it has the opportunity to allocate the risks of following specified design plans when it enters into a contract with a party involved in the network of contracts. In this situation, application of the economic loss rule encourages a subcontractor to protect itself from risks, holds the parties to the terms of their bargain, enforces their expectancy interests, and maintains the boundary between contract and tort law.
>
> The policies underlying the application of the economic loss rule to commercial parties are unaffected by the absence of a one-to-one contract relationship. Contractual duties arise just as surely from networks of interrelated contracts as from two-party agreements.

Id. at 72. The court concluded that "the duties allegedly breached were contained in the network of interrelated contracts, and the economic loss rule applies." Id. at 74.

The Rissler case from Wyoming, the Berschauer case from Washington, and the BRW case from Colorado all involve claims by contractors against engineers, not, as in the case before us, a project owner against engineers and design professionals. However, the substance of our holding is that when it comes to claims for pure economic loss, the participants in a major construction project define for themselves their respective risks, duties, and remedies in the network or chain of contracts governing the project. As a participant, this applies as much to the project owner as it does to contractors and subcontractors, engineers and design professionals, and others.

Finally, Gergen Restatement Draft § 8(3)(c)(i) provides that no exception to the economic loss rule is merited where "the plaintiff reasonably could have, by contracts with the defendant or through an intermediary, protected itself from the loss." We believe this principle is applicable to the facts of the case before us. We see no reason why the Library could not – and perhaps pending collateral litigation will prove that it did – reasonably protect itself from loss by contracts with the Defendants or through an intermediary. But we need not decide this case on a principle quite so broad. We hold instead that there is no liability in tort to the owner of a major construction project for pure economic loss caused unintentionally by contractors, subcontractors, engineers, design professionals, or others engaged in the project with whom the project owner, whether or not technically in privity of contract, is connected through a network or chain of contracts. This is the Library's situation here and the economic loss rule applies.

B

The Library makes a relatively brief argument that the economic loss rule should not be a bar to its claims against the Defendants because the Defendants have been guilty of providing false information to the Library. The Library invokes a number of cases from other jurisdictions that have allowed claims for purely economic loss to be maintained against engineers and design professionals who negligently misrepresent information to another. The Library correctly ob-

24

serves that most of these cases – including the three cited in note 16, <u>supra</u> – rely on Restatement (Second) of Torts § 552 (1976).[19]

Indiana has recognized liability for the tort of negligent misrepresentation. <u>Passmore v. Multi-Mgmt. Servs., Inc.</u>, 810 N.E.2d 1022, 1025 (Ind. 2004). In fact, we have said "negligent misrepresentation may be actionable and inflict only economic loss," citing § 552. <u>Greg Allen Constr. Co., Inc. v. Estelle</u>, 798 N.E.2d 171, 174 (Ind. 2003). But we need not give extended treatment to the claim raised here as we have, for all practical purposes, resolved it in our extended discussion in the preceding section of this opinion.

In another case we decide today, we recognize a claim of negligent misrepresentation as an exception to the general economic loss rule where a mortgage lender not in privity of contract with a title company seeks to recover for the title company's negligence in issuing a title commitment that failed to disclose an encumbrance. <u>See</u> <u>U.S. Bank, N.A. v. Integrity Land Title Corp.</u>, – N.E.2d –, No. 17S03-1002-CV-120, slip op. (Ind. June 29, 2010). But because the Library is connected with the Defendants through a network or chain of contracts, the economic loss rule precludes it from proceeding in tort in this case.

---

[19] Section 552 provides:

Information Negligently Supplied for the Guidance of Others.

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered: (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

## C

The Library makes a very brief argument that the economic loss doctrine should not apply in situations where a defendant provides solely services and not a tangible product. The Library acknowledges that we repeatedly say in Gunkel that the economic loss rule applies to services as well as products, 822 N.E.2d at 153, but points us to five cases from other jurisdictions in support of its contention that it should not, notably Insurance Co. of North America v. Cease Electric Inc., 688 N.W.2d 462, 464 (Wis. 2004).

In Cease Electric, the Wisconsin Supreme Court held that the rationale for the economic loss rule does not support applying it where a defendant provides services rather than a tangible product, even when the defendant does so pursuant to a contract. The court says this for what appear to us to be three major reasons. First, it finds that parties to contracts for services do not have as extensive a set of protections as parties to contracts for products because the warranty provisions of the Uniform Commercial Code do not apply to contracts for services. Second, it finds that contracts for services are often so "simple and informal" that they cannot be relied upon to allocate economic risk properly. And third, it finds that contracts for services can be insufficiently attentive to the broader societal interest in deterring negligent conduct. Id. at 470-71.

While it is true that the UCC does not apply to service contracts, the common law of contracts has a well developed set rules of interpretation and doctrines to protect the reasonable expectations of the parties. See Fresh Cut, Inc. v. Fazli, 650 N.E.2d 1126, 1133 (Ind. 1995) ("Rules of contract construction and extrinsic evidence need to be employed to determine and give effect to the parties' reasonable expectations.") Nor is contract law blind to public policy. See Straub v. B.M.T. by Todd, 645 N.E.2d 597, 598-99 (Ind. 1994) ("Where a properly formed agreement contravenes the public policy of Indiana, for instance, courts have traditionally said it is void and unenforceable.").

That having been said, we return again to a point made several times in the course of this opinion: that the economic loss rule is a general rule that admits of exceptions for contracts for services in appropriate circumstances. Indeed, we have mentioned possible exceptions (for pur-

poses of illustration only[20]) – lawyer malpractice, breach of a duty of care owed to a plaintiff by a fiduciary, breach of a duty to settle owed by a liability insurer to the insured, and negligent misstatement – that suggest situations in which the economic loss rule would not apply in the services context.

If called upon, we might well recognize an exception to the general economic loss rule in such limited circumstances. However, the policy justifications for the economic loss rule discussed throughout this opinion amply support applying the rule to products and services alike.

## Conclusion

We affirm the judgment of the trial court.

Shepard, C.J., and Dickson, Boehm, and Rucker, JJ., concur.

---

[20] These illustrations are situations where Gergen Restatement Draft § 12 recognizes "liability in tort for pure economic loss resulting from [a defendant's] negligent performance of a contract." See supra note 18.